## M. DeMatteo Construction Co. *vs.* Dewey E. Daggett & another.

Norfolk. May 2, 6, 1960. — June 28, 1960.

Present: Wilkins, C.J., Spalding, Williams, Whittemore, & Cutter, JJ.

*Contract,* For sale of real estate, Performance and breach, Validity. *Tender. Unsound Mind. Evidence,* Opinion: expert; Hypothetical question. *Equity Pleading and Practice,* Master: report of evidence, exceptions to report, recommittal, summary of evidence, conclusion of law.

A conclusion in a suit in equity that the buyer under an agreement for sale and purchase of real estate providing that "time is of the essence" was excused from tendering performance and was not barred by lack of a tender from obtaining specific performance was warranted where it appeared that shortly after the signing of the agreement the seller notified the buyer that he, the seller, was "set against going through with" it and desired to cancel it and proposed cancellation on certain terms, including a payment of damages to the buyer, that counter proposals were made by the buyer, but that, due to illness of the seller, it was agreed to leave matters in abeyance until a specified date, and that when that date arrived a few days after the buyer had been informed that the seller "was back in business" there had been no indication of any action by the seller on the buyer's counter proposals nor notice from the seller to the buyer that the agreement was to be performed on that date. [258-259]

In a suit against the operator of a wholesale lobster business and a dumping business for specific performance of a written agreement to sell to the plaintiff for one million dollars a large tract of marshland containing the dump, a conclusion that the defendant was mentally competent when he executed the agreement, even if mental depression then impaired his judgment, was warranted, in the absence of any showing that the terms of the agreement were so unfavorable to him or unusual as to require the opposite conclusion, by a master's findings

M. DeMatteo Construction Co. *v.* Daggett.

respecting the defendant's referral of the plaintiff and its broker to the defendant's attorney and the defendant's continuing "active interest in the transaction," his changing from a lease proposal to a sale for sound reasons, his "discussion about . . . commissions, cost of sale . . . [and] the capital gains tax," his being able to furnish his attorney the "cost base of fifty or more purchases which went into" the tract, his correction of a mathematical error, and his request that his attorney talk with his accountant about the accuracy of figures.   [259–261]

No merit appeared in an objection taken to a hypothetical question to an expert witness on the ground of alleged omission of pertinent facts.   [261]

An agreement for sale and purchase of real estate containing provisions that the seller should deed the premises to the buyer's nominee and that the "buyer" should give a mortgage "in the usual [statutory] form" conditioned on certain payments with interest, and not containing any provision for a mortgage note, was not so indefinite as to preclude the buyer from obtaining specific performance.   [261–262]

A provision of an agreement for sale and purchase of real estate, that "the time for delivery of the deed shall be extended as requested by the buyer in order to permit completion of its title examination," authorized a reasonable extension of time for performance notwithstanding another provision of the agreement that "time is of the essence."   [262]

There was no error in a suit in equity in denial of motions to recommit a master's report based on exceptions to his inappropriate recitals of evidence and to his failure to make certain findings in addition to adequate subsidiary findings made.   [262–263]

There was no abuse of discretion on the part of a judge hearing a suit in equity on a master's report in refusing to recommit the report for more adequate summaries of evidence where the summaries made and the report itself sufficiently set forth the evidential basis of the master's significant findings.   [263]

On appeal from a final decree in a suit in equity this court disregarded as a conclusion of law a conclusion of a master that the plaintiff was entitled to specific performance by the defendant of an agreement to convey land, but reached the same conclusion upon the subsidiary facts found by the master.   [263]

BILL IN EQUITY filed in the Superior Court on August 9, 1957.

The suit was heard by *Brogna,* J. on demurrer and by *Wisnioski,* J. on a master's report.

*John R. Ambrogne, (Paul G. Counihan & Philip D. Fine* with him,) for the defendants.

*Herman Snyder, (Richmond I. Bailen* with him,) for the plaintiff.

CUTTER, J.   This is a bill to obtain specific performance

of an agreement dated February 7, 1957, by which Daggett and his wife agreed to sell to the plaintiff (Construction) a large tract of marshland in Revere and Saugus. A demurrer was overruled. A master's report was favorable to Construction. The Daggetts filed motions to recommit the report (a) to require additional subsidiary findings; (b) to make certain findings; (c) to report portions of the evidence; and (d) to make further summaries of the evidence with respect to certain objections. An affidavit of counsel suggested what "would be brief, fair, and accurate summaries of evidence under Rule 90 of the Superior Court" (1954). See *Cantor* v. *Cantor*, 325 Mass. 719, 721. By counter affidavit, Construction's counsel submitted corrections of these suggested summaries. The motions to recommit were denied, together with motions to dismiss the bill and to discharge the reference to the master. An interlocutory decree was entered overruling the Daggetts' exceptions and confirming the report. From all these interlocutory decrees, and from a final decree ordering specific performance, the Daggetts have appealed. The facts are stated on the basis of the master's report.

Daggett owned the real estate (the locus), described in the agreement. He operated a wholesale lobster business on ten acres of land nearby. On January 31, 1957, Daggett talked with John DeMatteo of Construction and a broker and sent them to an attorney, Mr. Davis, to discuss leasing the locus, part of which was used for dumping. The next day Mr. Davis and Daggett went over the situation. On February 3, Daggett told Mr. Davis that he "did not want to lease, but rather wanted to sell." On February 5, Daggett discussed with Mr. Davis "the net [tax] result if he should sell, and whether he should sell for cash or on an instalment basis," and also the expense for brokers' commissions. Daggett stated "that he could not run two businesses, that he was extremely tired and would have to give up either the lobster . . . or the dumping business." He pointed out that the "lobster business was so precarious no one would buy it, so he would have to stay in that and

sell the dump." He authorized Mr. Davis to sell for $1,250,000.

Mr. Davis explained the situation to DeMatteo, who said he would prefer a lease, but when informed that "it was either a sale or nothing" DeMatteo offered $800,000, later raised to $1,000,000. Various matters, such as interest, were adjusted in negotiations, which Mr. Davis reported to Daggett who said, "Sell it." The agreement was drawn by Mr. Davis and counsel for Construction and "was handed to Mr. Davis to get . . . Daggett's signature." Mr. Davis on February 7 took the agreement to Daggett and his wife, who both signed it "after they had gone over it with Mr. Davis for over an hour." The agreements were delivered on February 8 and a certified deposit check was given.

Prior to February 7, Daggett "had been complaining about his health . . . [was] tired and in a state of depression." He had been released from a hospital on January 25, where he had been for examination by a Dr. Thorpe, who advised Daggett "to see a psychiatrist." Dr. Thorpe thought "Daggett's judgment was impaired." A few weeks later Daggett consulted a psychiatrist. All this was unknown to Construction's representatives on February 7 and 8.

On February 9 and 10, Daggett complained to Mr. Davis of the contract which he had made and "was critical of Mr. Davis for having permitted him to enter into the deal." On February 12, Mr. Davis, purporting to speak for the Daggetts, wrote to Construction, that "[w]e now desire to cancel this agreement . . . without any of us having any recourse against any other party." The letter proposed return of the deposit, payment of $10,000 by Daggett to Construction as damages, and a seven day option to Construction to purchase the land on the terms of any acceptable offer later made to Daggett.

On March 19, "there was a telephone conversation between . . . Mr. Snyder [attorney for Construction] and Mr. Davis, at which time Mr. Snyder . . . learned for the first time that . . . Daggett was ill and . . . would be unable to take part in any business discussions or transac-

tions for . . . at least six weeks." One of the DeMatteos had been told on February 12 of Daggett's illness. On March 20, Mr. Davis wrote to Mr. Snyder that "it is my suggestion that any . . . matters pending between . . . [Daggett] and your . . . client remain as is until . . . Daggett's recovery is to a point where his doctor sanctions his resumption of business matters." Mr. Snyder, the next day, agreed that all matters should remain "in statu quo for . . . six weeks [which, of course, would expire about May 1]. I assume [that] you will communicate with me on or before expiration of that time." In the meantime, on March 15, at a conference with Mr. Snyder and Martin DeMatteo, Mr. Davis had received from Construction three proposals for settling the matter, which Mr. Davis undertook to discuss with his client.

Mr. Snyder "would call Mr. Davis from time to time as the date [May 7] for passing papers set forth in the agreement approached." On May 22, Mr. Davis wrote to Mr. Snyder that Daggett's "doctor forbids him to attempt to transact any business . . . for at least the next month . . . . Mrs. Daggett concurs that . . . the time for performance of the agreement . . . should be considered as . . . postponed to a date not earlier than July 7." Construction's counsel on May 27 agreed that "all pending matters, agreements and offers . . . be postponed to July 7."

Subsequent to the May 22 letter, Mr. Snyder made inquiries from time to time of Mr. Davis and was told on each occasion that "Daggett was not physically able to transact business and that he would communicate with Mr. Snyder when the time arrived for relations to be resumed between the parties." On June 7, "Daggett returned to business for a half day, and thereafter" increased the "time spent at his business." Further inquiries were made by Mr. Snyder on July 1 and 2. Mr. Davis could not be reached from July 3 to 7. On July 3, Mr. Snyder wrote to Mr. Davis to inquire whether Mr. Davis had completed a title search on the property which Mr. Snyder said Mr. Davis had undertaken to make for Construction and asking him to

arrange any necessary postponement.  Mr. Davis received this letter on Monday, July 8, when new counsel for the Daggetts became associated with Mr. Davis.  No deeds to convey the locus that day were prepared by Mr. Davis and neither Mr. Snyder nor Mr. Davis went to either of the two registries of deeds (Essex and Suffolk) to make tender, although Mr. Davis checked by telephone to see whether Mr. Snyder was there.  Mr. Davis did not get in touch with Mr. Snyder on July 8, but on July 10 he notified Construction by mail of "Daggett's decision to rescind this agreement" and offered to return the deposit check.  On July 12, Mr. Snyder replied, reciting past events and saying that his client was "desirous of taking title" to the locus and had "been awaiting only the results of your title examination and . . . Daggett's recovery for the actual setting of the date for passing papers."  On July 24, Daggett's new counsel wrote that it was Daggett's "position . . . that the agreement dated February 7 . . . stands rescinded."  The bill for specific performance was initiated on August 8.

1.  The Daggetts contend that Construction failed to tender performance when due and has shown no excuse for such failure.  The master concluded that "every act of the . . . [Daggetts] or their attorneys . . . after February 7 . . . indicated a firm purpose to avoid the agreement even though the . . . [Daggetts] were to pay damages" and that representation of Construction on July 8 at the registries of deeds would have been "an empty . . . gesture."

Mr. Davis's letter of February 12 offered cancellation of the agreement on terms.  A possible cancellation remained the subject of negotiation thereafter.  On March 15, Mr. Davis informed Mr. Snyder that "Daggett is now set against going through with the agreement" and sought to work out "some other arrangement" about which Construction then made proposals.  On March 20 and 21, the attorneys reasonably arranged to keep the matter in statu quo pending Daggett's recovery.  The attorneys talked by telephone on April 25, May 9, May 14, and May 20.  From the letter of May 22 (Mr. Davis to Mr. Snyder) and the re-

ply of May 27, it is reasonable to infer that Mr. Davis had informed Mr. Snyder by May 7, the day set in the agreement for conveyance, that Daggett would not then be in a position either to convey or to consider Construction's March 15 settlement proposals. The exchange of letters confirmed that performance would not be sought prior to July 7. Since July 7 was a Sunday, this meant not before July 8. See G. L. c. 4, § 9. By that time there had been no final indication of any action by or in behalf of Daggett upon Construction's March 15 proposals. Indeed, it was only on July 2 that Mr. Davis even told Mr. Snyder that Daggett "was back in business for an hour or two a day." Although Mr. Davis promised to call Mr. Snyder the next day after consulting his client, Mr. Snyder did not hear from him.

In the circumstances, Mr. Davis's conduct over the months from February 12 to July 8 reasonably led Construction's representatives to understand, at least until July 2, that Daggett was unable to transact business, that matters were to be held in abeyance until he was able to act, that he wanted to negotiate an alternative arrangement, that he was not yet ready to negotiate or to perform, and that Construction would be notified when he was ready. On the facts found, it would be inequitable, even though the agreement provided that "time is of the essence" (cf. *Mansfield* v. *Wiles,* 221 Mass. 75, 81–82), to treat Construction as obliged to make tender on July 8, in the absence of seasonable notice by Daggett or Mr. Davis to Construction's representatives that performance was to take place on July 8. See *Leigh* v. *Rule,* 331 Mass. 664, 668–669, and cases cited. See also *Close* v. *Martin,* 208 Mass. 236, 240–241; *Vander Realty Co. Inc.* v. *Gabriel,* 334 Mass. 267, 270–271; *LeBlanc* v. *Molloy,* 335 Mass. 636, 638. Cf. *Siegel* v. *Shaw,* 337 Mass. 170, 175. Although the Daggetts' indications of refusal to perform perhaps were not as definite as those held to excuse tender of performance in certain earlier cases (see e.g. *Schilling* v. *Levin,* 328 Mass. 2, 5–6; cf. *Pomroy* v. *Gold,* 2 Met. 500, 503; *Smith & Rice Co.* v.

*Canady,* 213 Mass. 122, 124–125), the Daggetts had indicated through Mr. Davis that they definitely wished to buy their way out of the agreement. Daggett's illness and Mr. Davis's efforts to preserve the situation unchanged until Daggett himself was able to negotiate created a situation upon which Construction might properly rely until a reasonable time after Daggett was back at work and after Mr. Davis unequivocally stated his client's position on the pending proposals. Throughout the transaction Mr. Davis spoke for the Daggetts, even if he was bound to resort to Daggett for approval of substantive terms of the trade. The earliest indication that Mr. Davis was not authorized to speak for the Daggetts was on July 16 when another attorney wrote to Mr. Snyder. By that time it had been made clear that any tender by Construction would be useless. It could be concluded from the subsidiary findings already summarized that there was, in the circumstances, no necessity for Construction to tender performance on July 8.

2. What has just been said disposes also of Daggett's demurrer which was properly overruled. The bill sets forth in perhaps unnecessary detail the circumstances showing that Construction was excused from any tender on May 7, July 8, or any other day. As stated below, there is no merit in the Daggetts' contention that the agreement was too indefinite to be specifically enforced. The bill adequately alleged that Construction was ready, willing and able to perform at the date of the bill, August 8. This, in the light of the facts alleged, was clearly within a reasonable time after the Daggetts' repudiation of the agreement by letters on July 10 and July 16, the contents of both of which were adequately set out.

3. The master's conclusion (on conflicting medical and other testimony) that, on February 7, Daggett was competent to execute the agreement rested largely on (a) Daggett's action in referring John DeMatteo and the broker to his attorney, Mr. Davis, and his continuing ''active interest in the transaction''; (b) Daggett's sound shift from a lease proposal to a sale because ''it was getting burdensome to

try to run two businesses"; (c) his "discussion about . . . commissions, cost of sale, [and] the intricacies of the capital gains tax"; (d) "the fact that he was able to inform Mr. Davis of the cost base of fifty or more purchases which went into" the locus; (e) his correction of "an error that he had made in some figures"; and (f) his request that Mr. Davis talk with his (Daggett's) accountant about the accuracy of the figures. The master could reasonably conclude that these circumstances "indicated a mind of more than ordinary intelligence in handling a transaction involving a million dollars."

The master's subsidiary findings on this issue, although confused with inappropriate recitals of testimony (see *Lombardi* v. *Bailey,* 336 Mass. 587, 590–591), show that Daggett was depressed in the period before and after February 7. Also, although he "ordinarily had the utmost confidence in himself," he "had a history of periodic occasions of deep depression." He was "concerned about his family history" of psychotic illness and about "family relationships." On occasion "he would weep in public." As stated above, he saw Dr. Thorpe in January, 1957, and received advice from a psychiatrist, Dr. Wingate, on March 8. Then Daggett was "weeping and . . . depressed." Dr. Wingate prescribed shock treatments and twelve such treatments were given between March 15 and April 12. The patient showed improvement after the fourth treatment. Although Dr. Wingate suggested that Daggett "make no further major business decisions until Dr. Wingate approved," Daggett kept in touch with his business by telephone. On his own initiative, he went on a holiday trip in late April or early May.

These subsidiary findings do not require the conclusion that on February 7 Daggett, even if depression impaired his judgment, was "incapable of transacting the business" (see *Reed* v. *Mattapan Deposit & Trust Co.* 198 Mass. 306, 314) or that he "could not understand the nature . . . of the transaction or grasp its significance." See *Sutcliffe* v. *Heatley,* 232 Mass. 231, 232–233; *Meserve* v. *Jordan Marsh*

*Co.* 340 Mass. 660, 662. Daggett's discussions with the attorney who represented him (see *Willett* v. *Webster,* 337 Mass. 98, 103) justify the conclusion that he was then competent. The terms of the agreement are not shown to have been unfavorable or so unusual as to require the conclusion that Daggett, by agreeing to these terms, showed incompetence. See discussion in the *Meserve* case, *supra,* at pp. 662–668.

The Daggetts contend that the master's summaries under Rule 90 show insufficient evidence to justify certain subsidiary findings about Daggett's mental condition. Two such contentions relate to statements of testimony (not constituting findings). Any failure to recite testimony with precision is immaterial, for the recitals should not have been in the report at all. Another such exception related to a subsidiary finding that Daggett insisted that Mr. Davis give him an "outline" of what was said in a conference prior to February 7. The finding, read in the light of the master's summary of evidence and related portions of his report, was justified.

The Daggetts' trial counsel objected to a hypothetical question asked of a psychiatrist "on the grounds of omission of . . . pertinent evidence." A trial judge or master has a wide discretion with respect to hypothetical questions. *Taylor* v. *Creeley,* 257 Mass. 21, 27. See Wigmore, Evidence (3d ed.) § 682; McCormick, Evidence, § 14, at p. 32. See also *Commonwealth* v. *Russ,* 232 Mass. 58, 74. Apparently it is not disputed that there was evidence from which the facts stated in the question could have been found to be true. See *Davis* v. *Hotels Statler Co. Inc.* 327 Mass. 28, 31. Cf. *Brown* v. *United States Fid. & Guar. Co.* 336 Mass. 609, 614. If relevant facts were omitted, inquiry could have been made whether the inclusion of such facts would have changed the expert's opinion. Such omissions, of course, may affect the weight of the testimony. See *Davis* v. *Seller,* 329 Mass. 385, 388–389.

4. The Daggetts contend that the agreement was so indefinite that it cannot be specifically enforced. The agree-

ment provided that "the buyer shall execute and deliver . . . a mortgage deed . . . in the usual form with statutory mortgage covenants, conditions and powers of sale." It was to "be conditioned upon the payment . . . of the principal sum of . . . $800,000 . . . at the rate of not less than . . . $25,000 . . . per year . . . with interest . . . semi-annually on the unpaid principal balance at . . . 3½% per year." The buyer was to have the right "at any time, to prepay in whole or in part, the unpaid principal balance . . . with accrued interest." These provisions fairly describe a statutory mortgage running over a maximum term of thirty-two years. Taken together with the provision that the deed from the Daggetts could be "to such person or persons as the buyer may designate by written notice," the absence of any provision for a mortgage note was reasonable. A note was not necessary. *Pearson* v. *Mulloney,* 289 Mass. 508, 515–516. *Perry* v. *Miller,* 330 Mass. 261, 263. Swaim, Crocker's Notes on Common Forms (7th ed.) § 444. The provision that the locus might be conveyed to a nominee of Construction fairly implied that a mortgage executed by the nominee (and not by the buyer) would satisfy the agreement, despite the provision that "the buyer shall execute and deliver . . . a mortgage deed." In any event, Construction now seeks conveyance to it and not to a nominee. Other provisions of the agreement (relating to occupancy by the buyer before conveyance, an escrow agreement, and acceptance by the buyer of less than the whole locus with a proportionate reduction in price) have no present relevance (although they seem sufficiently definite) for Construction does not rely upon any of them. The provision that "the time for delivery of the deed shall be extended as requested by the buyer in order to permit completion of its title examination" authorized a reasonable extension of time. It also reduces greatly the significance of the provision that "time is of the essence," a provision upon which the Daggetts cannot rely equitably in the circumstances.

5. Certain exceptions to the master's report relate to the master's inappropriate recitals of evidence. Although

these should not have been included and must be disregarded (see *Joyner* v. *Lenox Sav. Bank,* 322 Mass. 46, 57–58; *Spirito* v. *Capar,* 337 Mass. 431, 432; *Sullivan* v. *H. P. Hood & Sons, Inc., ante,* 216, 218), their presence did not require recommittal of the report. Exceptions to the failure of the master to make findings did not require recommittal of the report. This was a matter within the judge's discretion. *New England Factors, Inc.* v. *Genstil,* 322 Mass. 36, 43. *DiMare* v. *Capaldi,* 336 Mass. 497, 501. The report made adequate subsidiary findings. Cf. *Turgeon* v. *Turgeon,* 326 Mass. 384, 386–387; *Frank* v. *Frank,* 335 Mass. 130, 136–137, *S. C.* 340 Mass 132.

The master's summaries of evidence were meager. Although the trial judge would have been justified in recommitting the report for more adequate summaries of evidence there was no abuse of discretion in his failure to do so. The summaries which the master made and the report itself sufficiently set forth the evidential basis of his significant findings, even if we were to assume that there was also evidence of the character described in the affidavit of the Daggetts' counsel. The master was not obliged to summarize evidence which he appears not to have believed and which he was not required to believe. *Sherman* v. *Sherman,* 336 Mass. 254, 259.

The master's conclusion that Construction was entitled to specific performance we disregard as a conclusion of law for the court, not for the master. Upon the facts found, however, we reach that conclusion ourselves. See *Ries* v. *Rome,* 337 Mass. 376, 380.

6. The interlocutory decrees and the final decree are affirmed. Construction is to have costs of this appeal.

*So ordered.*