# KIMM ET UX. *v.* ANDREWS

[No. 71, September Term, 1973.]

*Decided January 3, 1974.*

The cause was argued before MURPHY, C. J., and BARNES, McWILLIAMS, SINGLEY, SMITH, DIGGES and LEVINE, JJ.

*Vincent A. Mulieri*, with whom were *Thomas J. Wohlgemuth* and *Smith & Wohlgemuth* on the brief, for appellants.

*Marvin H. Anderson*, with whom were *Anderson & Anderson* on the brief, for appellee.

BARNES, J., delivered the opinion of the Court.

This appeal involves two written contracts for the sale of the same 53 acres of land and the improvements thereon in Gambrills, Anne Arundel County (the subject property), signed by the owners, J. Maurice Dicus, Jr. and his wife, Doris E. Dicus. The first contract was signed on December 10, 1970, with the appellants, Lloyd C. Kimm and his wife, Diana C. Kimm, as purchasers. The second contract was dated April 5, 1971 (but agreed upon and signed on April 4, 1971), with the appellee, Michael W. Andrews, as purchaser. The Circuit Court for Anne Arundel County (Wray, J.) granted specific performance of the Andrews contract by its decree of September 22, 1972, in which it also declared null

and void the deed from the Dicuses to the Kimms for the subject property and the purchase money mortgage from the Kimms to the Dicuses, both dated May 4, 1971, and recorded May 6, 1971. The principal issues in the case involve the validity of the first contract at the time the second contract was signed, the status of Mr. Andrews as a bona fide purchaser, and the determination of whether the Dicuses and the Kimms waived the provision in the first contract that time was of the essence and, if so, whether such a waiver was effective against Mr. Andrews.

The metes and bounds description of the subject property appearing in the deed of May 4, 1971, indicates that it is an irregularly shaped tract with eight corners. The improvements on the land consist of the home of the Dicuses and four other houses.

The first contract of December 10, 1970, was prepared by Ira J. Wagonheim, a member of the Bar, who acted as the attorney for the Dicuses in that transaction. It recited, *inter alia*, that the subject property "has a road frontage on Gambrills Road of eight hundred (800) feet, more or less" and that the selling price was $80,000 of which $500 had been paid prior to the signing of the contract and the balance to be paid as follows: an additional $29,500 to be paid at the time of settlement and the $50,000 balance to be financed by a purchase money mortgage, under terms and conditions set forth in the contract. The contract then provides:

> "It is expressly understood and agreed that this contract shall be subject to the following terms and conditions, and upon failure of any of said terms and conditions, this contract shall become null and void, and all deposit monies shall be promptly returned:
>
> LCK  1. Sellers will take back a purchase money mortgage for Fifty Thousand Dollars
> JMD  ($50,000.00), payable in twenty-five (25) years, said mortgage bearing interest at the
> DED  six          (6%)
> rate of ~~seven~~ per cent (~~7%~~) per annum,
> DCK  computed on the unpaid principal balance,

with the right of prepayment without penalty after the end of the tenth year; monthly installments to include principal and interest, with Buyers paying annual real estate taxes and other public charges assessed against the property. Buyers are also to insure the premises for not less than Fifty Thousand Dollars ($50,000.00) for benefit of sellers.

2. All houses situate on said premises are being sold 'as is'.

3. Sale includes: Kitchen stoves in all houses, one (1) refrigerator, one (1) Ward's freezer, space heaters and heating equipment in all houses.

4. Prior to settlement, Sellers will show Buyers location of boundary stakes, septic system and water pipes.

5. Settlement shall take place not later than March 31, 1971.

6. The hereinafter stated offer to sell said premises shall be revoked if not accepted by Buyers not later than December 18, 1970."

Later in the contract is the provision "time being of the essence of this Agreement."

The sellers also agreed to pay Charles H. Steffey, Inc., in cooperation with Earl Patterson Realty, a brokerage commission of 6% of the total sale price.

The Kimms are Koreans. They have been in the United States for a number of years. In this transaction, they were represented by Mrs. Virginia Lewis, a real estate agent employed by Charles H. Steffey, Inc. Mrs. Lewis had previously sold the Kimms three other properties in a period of four years prior to December 10, 1970. Mrs. Lewis prepared the first draft of the proposed contract of sale between the Kimms and the Dicuses and presented that draft to Earl Patterson, the listing broker, who was cooperating with Steffey. Mr. Patterson indicated that he

was not satisfied with the wording of the proposed contract and wished to have an attorney prepare the contract. Mr. Patterson later stated that Mr. Wagonheim (who has offices in the same building as Mr. Patterson) prepared the draft of the contract which, with certain amendments, was signed by the parties. The signatures of the Kimms were witnessed by Mrs. Lewis; Mr. Wagonheim witnessed the signatures of the Dicuses.

After the contract of December 10, 1970, was signed, Mrs. Lewis arranged for an appointment with the Dicuses to meet at the subject property on January 10, 1971, in order that Mr. Dicus could show the Kimms the boundary stakes, as well as the location of the septic system and the water pipes. When the parties met at the subject property on January 10, the ground was largely covered with snow as a result of a snowfall a few days before. Mr. Dicus was too ill to walk the boundaries, particularly in the snow. Mrs. Dicus apparently did not know the location of the boundaries, having never bothered to learn their location. Mrs. Lewis testified that Mr. Kimm appeared to be upset or angry about the condition of the pipes in the Dicuses' house. What was said between the Kimms, however, was said in Korean. Mrs. Kimm testified that her husband was upset only because he had taken a day off from work and was displeased about the inability of the Dicuses to show him the boundaries of the subject property.[1]

Mrs. Lewis testified that, thereafter, on behalf of the Kimms, she made repeated telephone calls to the office of Earl Patterson in an effort to make new arrangements for the Dicuses to show the Kimms the boundary lines, but without success. The boundary lines were never shown to the Kimms until shortly before the Dicuses executed a deed for the subject property to them on May 4, 1971.

Mrs. Kimm wanted the Dicuses to consent to certain amendments of the December 10 contract and she and Mrs.

---

1. The testimony indicated that the showing of the boundaries was important to the Kimms inasmuch as they had experienced some difficulty with the boundaries of the property on which they lived. In any event, this requirement was made a condition in the contract of December 10, 1970.

Lewis met in Mr. Wagonheim's office on January 30, 1971. Mrs. Lewis thought the meeting took place on February 6, 1971, but the precise date of the meeting is immaterial. Mrs. Kimm at this meeting indicated that she wanted the December 10 contract amended in three particulars, *i.e.*, (1) a reduction in the rate of interest on the purchase money mortgage; (2) a reduction in the required amount of fire insurance; and, (3) a one-month deferment from payment of the $29,500 due at settlement. The Dicuses rejected all of these proposed amendments. At the January 30 (February 6), 1971, meeting in Mr. Wagonheim's office, Mr. Wagonheim suggested that Mrs. Kimm might wish to invest her money in the Delaware farm the Dicuses were buying, but Mrs. Kimm stated: "oh no, I want the [subject] property."

Mrs. Kimm acquiesced in the rejection by the Dicuses of the proposed amendments and began to prepare for settlement by ordering a title search for the subject property in the middle of February, 1971, from the Central Maryland Title Company, Inc., with which William A. Hackney, an attorney, is affiliated.

On March 1, 1971, Mrs. Lewis and Mr. Patterson met in the office of Mr. Hackney, who, as already indicated, is affiliated with the Central Maryland Title Company, Inc., which was employed by the Kimms to search the title of the subject property. Mr. Hackney's office is in the Steffey Building across the hall from the office of Mrs. Lewis. It was at this meeting that March 30, 1971, was selected as the date for settlement. Although no written notice of the settlement date was sent to the Kimms either by Patterson, Hackney, or Wagonheim, Mrs. Lewis testified that she told Mrs. Kimm of the proposed settlement date and that Mrs. Kimm agreed to the date, provided the boundary lines were shown to the Kimms prior to that date.

An arrangement had been made for the Kimms to meet the Dicuses at the subject property on March 24, 1971, so that the boundaries, septic system, and water pipes could be shown to the Kimms. On March 24, however, Mr. Patterson telephoned the office of Mrs. Lewis and left a message that

Mr. Dicus was in the hospital with pneumonia. This message was passed on to the Kimms.

Mr. Wagonheim testified that on March 27, 1971, Mr. Hackney telephoned him, stating that the Kimms wanted the boundaries shown to them prior to settlement. The boundaries, however, were not shown to the Kimms and, on March 29, 1971, Mr. Hackney left a message at Mr. Wagonheim's office to the effect that the Kimms were not coming to the settlement. Mrs. Lewis and the Kimms apparently believed that the settlement would not take place on March 30 in view of the information given them that Mr. Dicus was in the hospital with a serious illness. Unknown to them, however, Mr. Wagonheim had obtained the signatures of Mr. and Mrs. Dicus on a deed for the subject property and also on a letter authorizing Mr. Wagonheim to make the affidavit in regard to consideration on the proposed purchase money mortgage. The signatures on these documents were obtained by Mr. Patterson at Mr. Wagonheim's request. Mr. Wagonheim advised Mrs. Dicus not to attend the settlement because, he said, it could "be very ugly at a settlement."

On March 30, 1971, Mr. Wagonheim and Mr. Patterson appeared at Mr. Hackney's office, expecting the Kimms to settle at that time. Mr. Dicus was still in the hospital and Mrs. Dicus, taking the Wagonheim advice, did not appear at the settlement. The Kimms also did not appear at the settlement. Mrs. Lewis did not appear until she was notified that Mr. Wagonheim and Mr. Patterson were present and were expecting settlement to take place. Mrs. Lewis then tried to telephone the Kimms from Mr. Hackney's office, but was unable to reach them. During the evening of March 30, Mrs. Lewis told Mrs. Kimm what had previously happened. On March 31, 1971, Mrs. Kimm told Mrs. Lewis that the parties should still settle for the subject property, but that $1,000 should be held in escrow until Mr. Dicus was able to walk the boundaries of the property. Under this proposal, Mr. Dicus would have three months to walk the boundary lines and settlement could take place on Monday, April 5, 1971. This proposal was communicated to Mr. Wagonheim

by Mrs. Lewis on March 31. Mr. Wagonheim recalled that the proposal was communicated to him on April 1, but he was not sure of the date. In any event, the same day the proposal was made to him, Mr. Wagonheim relayed it to the Dicuses by telephone. Mr. Wagonheim, as agent for the Dicuses, made a counterproposal that only $500 be withheld from the settlement and held in escrow; that Mr. Dicus obtain the approval of his physician before trying to walk the boundaries; that the Dicuses be permitted to occupy the subject property free of rent for 30 days; and, that an extension on the settlement for the Delaware property being purchased by the Dicuses be obtained. After Mr. Wagonheim told Mrs. Lewis of this proposal for settlement, she communicated it to the Kimms the same day; and they accepted it on either April 2 or 3, 1971.

On Friday, April 2, or Monday, April 5, Mrs. Kimm consulted R. Tilghman Brice, III, an attorney practicing in Annapolis, in regard to having the terms of the extension reduced to writing. Unknown to the Kimms, however, on or about April 3, Mr. Wagonheim learned from Richard Nelson, a realtor, that Michael W. Andrews, the appellee, was interested in acquiring the subject property. On April 3, Nelson, Patterson, and Wagonheim met in Wagonheim's office. At this meeting, Wagonheim expressed the opinion that the contract with the Kimms had lapsed by its own terms; but he did not tell either Nelson or Patterson that he, as agent for the Dicuses, had negotiated an extension for the time of settlement with the Kimms.

The following day, Sunday, April 4, Nelson took Andrews, for the first time, to the subject property to inspect it. Later, the same day, Andrews signed a contract with the Dicuses for the purchase of the subject property, although this contract was dated April 5, 1971. Prior to signing the contract, Andrews knew there had been a prior contract for the sale of the subject property and he learned through his agent, Nelson, of Wagonheim's opinion that the prior contract was null and void inasmuch as the purchasers had not attended settlement within the time limit in the prior contract.

On Monday, April 5, Mr. Wagonheim notified Mrs. Lewis that "Mrs. Kimm is out." The Kimms, thereafter, on or about April 13, 1971, retained the services of Jerome F. Connell, Sr., an attorney, to represent them. Mr. Connell wrote the Dicuses on behalf of the Kimms, threatening a suit against them for specific performance of the contract of December 10, 1970. At the time of that letter, the Dicuses terminated the services of Mr. Wagonheim. On April 9, 10 or 12, 1971, Mr. Andrews learned from his agent, Nelson, that the Kimms intended to enforce their rights under the prior contract of December 10, 1970. The Kimms recorded their contract among the land records of Anne Arundel County on April 16, 1971.

On April 28, 1971, Mr. Andrews appeared at the office of the Central Maryland Title Company, Inc., for settlement under his contract of April 5 (4), 1971. By this time, however, the Dicuses had retained John Demyan, Jr., an attorney, to represent them. Mr. Demyan, representing the Dicuses, refused to proceed to settlement with Mr. Andrews, stating that the Dicuses were going to settle on the Kimm contract instead. Mr. Andrews, after settlement with him had been refused, consulted counsel and upon counsel's advice recorded his contract, dated April 5, 1971, among the land records of Anne Arundel County on April 28, 1971.

On May 4, 1971, the Dicuses, after showing the Kimms the boundary lines of the subject property, executed a deed for the property in accordance with the terms of the December 10, 1970, contract. Both the deed and the purchase money mortgage provided for in the Kimm contract (also dated May 4) were recorded on May 6, 1971, among the land records of Anne Arundel County. The Kimms have been in possession of the subject property since May 4, 1971.

Mr. Andrews filed his bill of complaint against the Kimms and the Dicuses on May 13, 1971, in the Circuit Court for Anne Arundel County, praying that specific performance of his contract dated April 5, 1971, be granted against the Kimms as successors in interest of the Dicuses; that the right, title, and interest of the Kimms in the subject property be impressed with a trust in favor of Andrews; that

the Kimms be enjoined from transferring or encumbering the subject property *pendente lite;* that a receiver be appointed to take charge of the property, collect the rents, and account to the court; that the purchase money mortgage of May 4, 1971, be declared void and cancelled; that the Kimms surrender possession of the subject property to Andrews; that the court enter a monetary decree for $75,000 damages against the Dicuses; and that Andrews have other relief.

The Kimms and Dicuses duly answered the bill of complaint on June 17, 1971. After the taking of substantial testimony, the submission of memoranda by counsel for the respective parties, and the hearing of argument, the chancellor granted the motion of Andrews to strike all evidence with respect to the continuing negotiations between the Kimms and the Dicuses after March 31, 1971, upon the theory that they were within the purview of the Statute of Frauds and that Andrews could avail himself of the protection of that statute. Later, on September 1, 1972, the chancellor filed a written opinion which, after reciting many of the facts already given, stated:

"The parties agree that a contract with a 'time of the essence' clause must ordinarily be performed by the date set, or it is no longer viable, *Triton Realty Company v. Frieman,* 210 Md. 252 (1956). But the defendants say the contract is still 'enforceable,' citing *Shoreham v. Randolph Hills,* 248 Md. 267 (1967), because the Dicuses had not performed by showing the boundary stakes, etc., and continued to negotiate with the Kimms. *Shoreham* speaks a different doctrine to the Court. The Court of Appeals cites with approval Professor Corbin at page 274: 'An oral agreement fixing a new date would not be enforceable as a contract; but it may nevertheless prevent the vendor from defending on the ground that payment was not made on time.' This seems to say that the Dicuses would be under a disability to raise the defense of the Statute of Frauds if the Kimms sued them for specific

performance. The defendants do not show how that disability attaches to Andrews, who contracted knowing only that there had been a prior contract, and that Wagonheim thought it 'dead'. But without their disability, Andrews can rely on the Statute of Frauds, *Vancloostere v. Logan*, 36 N.E. 946 (Ill. 1894), *Gohlke v. Davis*, 279 S.W. (2d) 369 (Tex. Civ. App. 1955), *O'Banion v. Paradiso*, 393 P. (2d) 682 (Cal. 1964) with respect to any evidence of any agreement for an extension of time for settlement of the Kimm contract, or with respect to any of the Dicuses' conduct, not known to him.

"The Plaintiff is entitled to specific performance. Counsel may submit a proposed Decree."

The decree, dated and filed on September 22, 1972, provides that Andrews is entitled to specific performance of his contract of April 4, 1971 (dated April 5, 1971); that the deed and mortgage of May 4, 1971, are null and void; that a trustee is appointed to act for the Dicuses to execute any necessary papers to effect settlement under the Andrews contract; and that the Kimms are to pay the costs. From this decree, a timely appeal was perfected to this Court.

Three questions are presented to us for decision:

(1) Was the first contract, dated December 10, 1970, for the sale of the subject property a valid and binding agreement on April 4, 1971, when the second contract (dated April 5, 1971) was entered into for the sale of the same property?

(2) Did the evidence indicate that Andrews was not entitled to protection as a bona fide purchaser for value without notice of the prior equity of the Kimms?

(3) Did the Dicuses and the Kimms waive the provision in the contract of December 10, 1970, that time was of the essence and was such a waiver effective against Andrews, the subsequent purchaser?

We have concluded that all three questions should be answered in the affirmative and that the decree of September 22, 1972, must be reversed.

(1)

We are of the opinion that the contract of December 10, 1970, for the sale of the subject property was a valid and binding agreement on April 4, 1971, when the second contract (dated April 5, 1971) was entered into for the sale of the same property.

As the chancellor observed, the parties do not dispute that *ordinarily* a contract for the sale of land containing a clause that "time is of the essence" must be performed by the date fixed in the contract or the contract is no longer viable. This general rule is, however, subject to the limitation that such a contract may nevertheless be specifically enforced if the failure to perform within the designated time results from the act or fault of the party against whom specific performance is demanded. We think our predecessors put it well in *Budacz v. Fradkin*, 146 Md. 400, 407, 126 A. 220, 222-23 (1924), Judge W. Mitchell Digges stating for the Court:

"[W]here the terms of a contract expressly provide that it shall be completely performed and consummated by a certain date named therein, courts of equity are bound to give full force and effect to the terms thereof, unless the failure to perform by the time designated is caused by the act or default of the party against whom specific performance is asked to be decreed, whether he be vendor or vendee."

The Court cited with approval the decision of the Supreme Court of the United States in *Cheney v. Libby*, 134 U. S. 68, 10 S. Ct. 498, 33 L. Ed. 818 (1890) in which Mr. Justice Harlan, for the Supreme Court, stated:

"The parties in this case, in words too distinct to leave room for construction, not only specify the time when each condition is to be performed, but declare that 'time and punctuality are material and essential ingredients' in the contract; and that it must be 'strictly and literally' executed. However harsh or exacting its terms may be, as to the

appellee, they do not contravene public policy; and, therefore, a refusal of the court to give effect to them, according to the real intention of the parties, is to make a contract for them which they have not chosen to make for themselves. * * * But there are other principles, founded in justice, that must control the decision of the present case. Even where time is made material, by express stipulation, the failure of one of the parties to perform a condition within the particular time limited, will not in every case defeat his right to specific performance, if the condition be subsequently performed, without unreasonable delay, and no circumstances have intervened that would render it unjust or inequitable to give such relief. The discretion which a court of equity has to grant or refuse specific performance, and which is always exercised with reference to the circumstances of the particular case before it * * * may, and of necessity must often be controlled by the conduct of the party who bases his refusal to perform the contract upon the failure of the other party to strictly comply with its conditions."

134 U. S. at 77-78, 10 S. Ct. at 501-02, 33 L. Ed. at 823.

It is clear to us from the evidence that, although settlement did not take place by March 31, 1971, as required by Condition No. 5, the Dicuses did not show the Kimms the "location of boundary stakes, septic system and water pipes" as required by Condition No. 4 "prior to settlement" which was originally scheduled for March 30, 1971. The parties were at the subject property for the purpose of locating the aforementioned items on January 10, 1971; but Mr. Dicus was too ill, especially with the snow-covered ground, to show the boundaries, and Mrs. Dicus did not know where the boundaries were, never having made an attempt to locate them. As previously mentioned, after this meeting, Mrs. Lewis on behalf of the Kimms made numerous telephone calls to Mr. Patterson, the agent and realtor of the Dicuses,

to arrange for another appointment at the site of the subject property. These efforts were unavailing. Mrs. Kimm testified, without contradiction, to an appointment at the site for March 24, 1971. This, however, was cancelled because Mr. Dicus was hospitalized on that day. On March 27, 1971, Mr. Hackney, whose title company had been employed by the Kimms to search the title to the subject property, warned Mr. Wagonheim, then attorney for the Dicuses, that the Kimms "wanted to have the boundaries walked off" prior to settlement. The testimony indicates that the Kimms were ready, willing, and even eager to settle for the subject property; but they insisted that the obligation of the Dicuses to show the location of the boundaries, septic tanks and water pipes at the subject property be performed. They had arranged for the title examination. They had made arrangements to withdraw the necessary funds from their bank to complete the settlement. The Kimms, who did not tender the purchase price to the Dicuses on or before March 31, 1971, could, under the circumstances, nevertheless be entitled to specific performance of the contract where this failure to perform the condition precedent was caused by the conduct of the Dicuses. In *Shoreham Developers, Inc. v. Randolph Hills, Inc.*, 248 Md. 267, 275, 235 A. 2d 735, 741 (1967), we considered this principle and cited with approval Professor Corbin in 2 Corbin on Contracts § 310, at 112 (1950), as follows:

" 'Where "time was of the essence"—that is, where performance by the plaintiff within a specified time was a condition precedent to the defendant's duty to perform his part—if the plaintiff has been caused to delay his performance beyond the specified time by the request or agreement or other conduct of the defendant, the plaintiff can enforce the contract in spite of his delay. This assumes that the non-performance of the condition was not caused by the plaintiff's own inability to perform, and that but for the defendant's request, agreement, or other conduct, the plaintiff would have performed the condition. If the defendant

later repudiates or otherwise breaks the contract, he cannot use the plaintiff's failure to perform on time as a defense.' (*Citing Walter v. Victor G. Bloede Co.*, 94 Md. 80, 50 A. 433 (1901).)"

It is clear to us that Conditions Nos. 4 and 5 in the contract of December 10, 1970, are mutually dependent and, by their terms, must be read together. Condition No. 4 provides that *"Prior to settlement,* Sellers will show Buyers location of boundary stakes, septic system and water pipes" and Condition No. 5 provides "*Settlement* shall take place not later than March 31, 1971." (Emphasis supplied.) In *K & G Construction Co. v. Harris*, 223 Md. 305, 312, 164 A. 2d 451, 454-55 (1960) Judge Prescott, for the Court, in discussing the law in regard to promises and counter-promises, stated:

"Promises and counter-promises made by the respective parties to a contract have certain relations to one another, which determine many of the rights and liabilities of the parties. Broadly speaking, they are (1) independent of each other, or (2) mutually dependent, one upon the other. They are independent of each other if the parties intend that *performance* by each of them is in no way conditioned upon *performance* by the other. 5 *Page, The Law of Contracts*, § 2971. In other words, the parties exchange promises for promises, not the *performance* of promises for the *performance* of promises. 3 *Williston, Contracts* (Rev. Ed.), § 813, n. 6. A failure to perform an independent promise does not excuse non-performance on the part of the adversary party, but each is required to perform his promise, and, if one does not perform, he is liable to the adversary party for such non-performance. . . . Promises are mutually dependent if the parties intend *performance* by one to be conditioned upon *performance* by the other, and, if they be mutually dependent, they may be (a) precedent, *i.e.*, a promise that is to be performed before a corresponding promise on the part of the

adversary party is to be performed, (b) subsequent, *i.e.*, a corresponding promise that is not to be performed until the other party to the contract has performed a precedent covenant, or (c) concurrent, *i.e.*, promises that are to be performed at the same time by each of the parties, who are respectively bound to perform each. *Page, op. cit.*, §§ 2941, 2951, 2961."

We later stated in the opinion in *K & G Construction:*

"The modern rule, which seems to be of almost universal application, is that there is a presumption that mutual promises in a contract are dependent and are to be so regarded, whenever possible. *Page, op. cit.*, § 2946; Restatement, *Contracts*, § 266. *Cf. Williston, op. cit.*, § 812."
223 Md. at 313, 164 A. 2d at 455.

In addition to the language of the contract itself, other evidence indicates that the parties intended Conditions Nos. 4 and 5 to be mutually dependent. The Kimms knew that the Dicuses were moving to Delaware and would not be in a position after settlement to show the boundary stakes, the septic system, and water pipes. Condition No. 4 was an essential part of the contract in view of the irregular shape of the subject property which has eight corners and the difficulty the Kimms previously had with the boundary lines of property purchased by them, thus making them insistent on understanding the boundaries of the subject property prior to settlement. Then too, the parties met on the subject property on January 10, 1971, to fulfill the condition prior to settlement; indicating an intention of the parties that the showing of the boundaries, septic tanks, and water pipes was a condition precedent to the duty of the Kimms to tender the purchase price by March 31, 1971.

Mr. Andrews earnestly contends that the contract states that "upon failure of any of said terms and conditions, this contract shall become null and void, and all deposit monies shall be promptly returned" and that inasmuch as

settlement did not take place by March 31, 1971, the contract became null and void by its terms. This contention might have merit if both parties to the contract had done nothing and had merely allowed the settlement date to pass without attempting to perform their respective promises. *See Triton Realty Co. v. Frieman,* 210 Md. 252, 123 A. 2d 290 (1956). Under such facts, it would appear that neither party would have breached the contract, but the contract would have become null and void, a rescission would have resulted, and neither party would be entitled to specific performance of the contract.

In the present case, however, the evidence establishes that the failure of the Dicuses to show the boundary stakes, the septic system, and the water pipes of the subject property was the *only* reason why settlement did not take place before March 31, 1971; and the Dicuses knew or should have known that the Kimms were *insisting* upon compliance with the provisions of Condition No. 4, which was inserted in the contract for their benefit. In *Brewer v. Sowers,* 118 Md. 681, 86 A. 228 (1912), our predecessors considered the provision of an option contract to purchase a 60-acre farm in Washington County which provided: "If at the expiration of the time above mentioned the terms as set forth have not been complied with, then this option shall be considered as null and void." The seller deliberately avoided the purchaser to prevent a tender of the money provided for in the option contract. In affirming a decree granting specific performance, *inter alia,* to the purchaser, Chief Judge Boyd stated for the Court:

> "To deny Sowers [the purchaser] relief under such circumstances on the ground that the balance of the purchase money was not actually paid by the time named in the agreement, would not only be without precedent, but contrary to every principle of justice and equity which are supposed to control Courts of Equity."
> 118 Md. at 686, 86 A. at 230.

*See* 3A Corbin on Contracts § 761, at 516-22 (1960).

Although there is no evidence in the instant case to indicate that the Dicuses *deliberately failed* to perform Condition No. 4, the effect is the same as if they had deliberately failed to perform. The Kimms relied upon the Dicuses to perform Condition No. 4 of the contract prior to settlement. When advised that Mr. Dicus was in the hospital, they reasonably concluded that there would be no settlement on March 30, 1971, since he would be unable to show the boundaries until discharged from the hospital and since he would not be present at the settlement to execute the necessary papers. Neither Mr. Wagonheim nor Mr. Patterson told Mrs. Lewis or the Kimms of the arrangement made to obtain the signature of Mr. Dicus on the deed and on the authorization from him to Mr. Wagonheim to make the affidavit of consideration on the mortgage. Both Mrs. Lewis and the Kimms reasonably believed that the proposed settlement on March 30, 1971, would not be held and there was no obligation on the part of the Kimms to tender the purchase money on or before March 31, 1971. Indeed, the Kimms were not obligated legally to have attended the proposed settlement òn March 30 inasmuch as a condition of the contract of December 10, 1970, had not been fulfilled. Thus their appearance at the proposed settlement would have been useless. Indeed, if the Kimms had attended and had completed the proposed settlement on March 30, it would most likely have resulted in a waiver of Condition No. 4 of the December 10 contract. *See Shoreham Developers, Inc. v. Randolph Hills, Inc., supra.* As we have indicated, the Kimms had no intention whatever of waiving Condition No. 4; and they never did waive that condition. In sum, the Kimms were entitled to have the Dicuses specifically perform the contract; and, if they had sued the Dicuses for specific performance, they would most likely have been successful in such a suit. It is apparent to us that when Andrews entered into the second contract with the Dicuses on April 4 (5), 1971, the contract of December 10, 1970, was a legally effective contract and the Dicuses, as sellers, could not pass equitable title to Andrews.

The appellee Andrews relies, *inter alia,* on our decision in

*Triton Realty Co. v. Frieman, supra,* and upon a decision by the Supreme Court of Illinois in *Horan V. Blowitz,* 13 Ill. 2d 126, 148 N.E.2d 445 (1958). In our opinion, this reliance is misplaced inasmuch as in neither case did the purchaser present sufficient evidence of a legal excuse or justification for not proceeding to settlement within the time limits set forth in the respective contracts in those cases. In *Horan,* for example, where both the purchaser and the seller failed to fulfill their obligations under the contract within the time set and neither had a justifiable excuse for failing to perform, the Court held that the contract was null and void and each party is prevented from enforcing the contract since, on the stipulated date, the contract expired by its own terms. In the present case, as we have observed, the Kimms, as purchasers, did have a legal excuse or justification not to settle by March 31, 1971, namely, the failure of the Dicuses to comply with Condition No. 4 prior to the time fixed for settlement.

At the argument, counsel for Mr. Andrews called our attention to, and relied upon, the decision of this Court in *Hill v. Benevicz,* 224 Md. 79, 167 A. 2d 104 (1961). In *Hill,* however, the purchasers waived the condition precedent upon which they relied to justify their failure to attend settlement and perform their obligations pursuant to the contract of sale in that case. In the present case, there was no waiver by the Kimms of the requirement that the Dicuses perform Condition No. 4 in the contract of December 10, 1970.

(2)

We next consider whether Mr. Andrews was a bona fide purchaser of the subject property without notice of the preexisting contract of December 10, 1970, between the Dicuses and the Kimms.

There is little doubt that Andrews knew on April 4, 1971, prior to signing the second contract of sale, that the Dicuses had signed a prior contract for the sale of the subject property.

On Direct examination, Mr. Andrews testified that he had

been told by Mr. Nelson, on or prior to April 4, 1971, that "the people didn't show up at the settlement . . . and the contract was dead." He further stated in reply to questions: "Yes . . . there was a prior contract." There is also no doubt that Mr. Nelson, Mr. Andrews' agent, at a conference with Mr. Wagonheim prior to April 4, 1971, had heard Mr. Wagonheim express his opinion that the prior contract "lapsed on its own terms. It no longer had any life in it and the property was available." Mr. Nelson's testimony is interesting in this regard. According to Mr. Nelson, prior to telephoning Mr. Andrews on Friday, April 2, 1971, Mr. Patterson had told Mr. Nelson:

> "[T]hat there had been a contract on the property and that to the best of his knowledge, it was voided as the buyers had not attended settlement and they had not come up with any indication to them of further action in the form of writing, so with this, he wanted to be sure of it, we went on into the same office building which houses both the Patterson Real Estate Company as well as Ira Wagonheim, who was the lawyer for the Dicuses at this particular time, and Mr. Wagonheim indicated also that to the best of his knowledge, this contract was void and that the property was available for sale.
>
> "Q. Referring to an earlier contract that the Dicuses had apparently had for the sale of this property? A. Correct."

Mr. Nelson also stated that he knew that Mr. Wagonheim was the attorney for the sellers, Dicus and wife.

In our opinion, the knowledge by Mr. Andrews and by his agent, Nelson, of the existence of the prior contract of sale of the subject property was sufficient to place Andrews on inquiry in regard to the true situation as to whether the prior contract was still in effect. Andrews was not entitled to rely on *an opinion* by the attorney for the sellers that the prior contract was "dead." He did not seek any opinion of counsel for himself and made no inquiry of the Dicuses — although he was in their presence on April 4 — in regard to

the prior contract. He sought no release from the effect of the prior contract from the Kimms and did not request any indemnification agreement by the Dicuses in regard to the prior contract. If he had made an inquiry, he would most likely have discovered the true facts and would not have signed the second contract and made the $1,000 deposit.

Judge Smith, for the Court, stated the applicable law in *Fertitta v. Bay Shore Development Corp.*, 266 Md. 59, 72-73, 291 A. 2d 662, 669 (1972), as follows:

> "The 'applicable law has been most recently summed up for the Court by Judge Barnes in *Williams v. Skyline Dev. Corp.*, 265 Md. 130, 164-65, 288 A. 2d 333 (1972), a case involving one of the Jenkins corporations which is also involved here. In determining whether a purchaser had notice of any prior equities or unrecorded interests, so as to preclude him from being entitled to protection as a bona fide purchaser, the rule is that if he had knowledge of circumstances which ought to have put a person of ordinary prudence on inquiry, he will be presumed to have made such inquiry and will be charged with notice of all facts which such an investigation would in all probability have disclosed if it had been properly pursued. A purchaser cannot fail to investigate when the propriety of the investigation is naturally suggested by circumstances known to him. If he neglects to make such inquiry, he will be guilty of bad faith and must suffer from his neglect. That which is sufficient to excite inquiry is notice of such facts as would lead an ordinarily prudent man to make an examination. Notice to an attorney is notice to his client."

Andrews was not entitled to rely upon an opinion of the attorney *for the sellers* that the prior contract was "dead" and that the subject property was "available for sale" to Andrews. The sellers' attorney is likely to be an advocate, and thus not a purely objective source, in support of *his*

*clients'* supposed right to sell the property. *See Price v. McDonald,* 1 Md. 403, 416 (1851). Then too, Mr. Andrews is not lacking in sophistication in real estate matters, having "bought and sold a number of pieces of real estate in Anne Arundel County" during the 29 years he has been in that county. In our opinion, Andrews had or was charged with knowledge of the pre-existing equity in the Kimms prior to signing the second contract of sale and making the deposit of $1,000.

It should be observed that Mr. Andrews knew prior to the proposed settlement under the second contract scheduled for April 28, 1971, that the Kimms would assert their rights under the first contract and, indeed, new counsel for the Dicuses told Andrews at the time of the proposed settlement that the Dicuses would not settle under the second contract but would carry out their obligations under the first contract of December 10, 1970. In short, Andrews unquestionably had actual knowledge of the prior equity prior to any payment of the purchase money (other than the $1,000 deposit) and, indeed, no balance of purchase money was paid. Even if he had paid that balance, the prior equity would prevail. *Westpark, Inc. v. Seaton Land Co.,* 225 Md. 433, 171 A. 2d 736 (1961).

(3)

We now turn to a consideration of the question of whether there was an effective waiver of the provision in the contract of December 10, 1970, that time was of the essence; and, if so, was it effective against Andrews, as the subsequent purchaser.

The chancellor, in effect, assumed that the Dicuses could not raise the defense of the Statute of Frauds in this case — a correct assumption, in our opinion — but the chancellor concluded that the disability of the Dicuses did not attach to Andrews — a conclusion we think was clearly in error.

As a consequence of this error, the chancellor erroneously granted Andrews' motion at the conclusion of the entire case to strike all evidence concerning oral negotiations subsequent to March 31, 1971, between the Dicuses and the Kimms to extend the settlement date.

The relevant provisions of Maryland's Statute of Frauds appear in Maryland Code (1957, 1973 Repl. Vol.) Art. 21, § 2-104 entitled "Executory contracts" and are as follows:

"No action shall be brought:"

* * *

"(d) Upon any contract for the sale or disposition of land or of any interest in or concerning land; "

* * *

"unless the contract or agreement upon which such action shall be brought, or some memorandum or note thereof, shall be in writing and signed by the party to be charged therewith, or some other person by him lawfully authorized." [2]

There is no question that the contract of December 10, 1970, was in writing and signed by the parties to be charged. That contract, as we have already indicated, was valid and binding and was specifically enforceable by the Kimms, the Dicuses having no election to rescind the December 10 contract, not having performed Condition No. 4 prior to settlement — a condition precedent to settlement when the contract with Andrews was signed.

In any event, however, the extension of time negotiated by Mr. Wagonheim on behalf of the Dicuses amounted to a waiver of the "time is of the essence" provision of the

2. The new Statute of Frauds was enacted by the General Assembly by the Act of 1971, Ch. 649, § 5. The provision in regard to the enforcement of certain executory contracts is substantially the same as in the British Statute of Frauds, 29 Charles II, Ch. 3, enacted in 1677. This British Statute is listed in the Act of 1971. Ch. 649, § 10 as one of the British Statutes declared as no longer in force in Maryland "except to the extent that any of the British Statutes in force in Maryland on July 4, 1776 [as 29 Charles II, Ch. 3 clearly was] have been enacted by the General Assembly of Maryland, either *by this Act* or by any other Act or Acts in force on July 1, 1971," the effective date of the Act of 1971, Ch. 649. (Emphasis supplied.) Inasmuch as substantially the same provisions of the British Statute of Frauds are enacted by the Act of 1971, Ch. 649, it appears that the provisions of that British Statute continue intact in Maryland with all of the Maryland and British cases construing this section of the British Statute of Frauds being persuasive or authoritative, as the case may be.

December 10 contract. This waiver is not required to be in writing even though the contract itself is subject to the applicable provision of the Statute of Frauds. Professor Corbin, in 3A Corbin on Contracts § 722, at 380 (1960), states:

> "Where time is of the essence, meaning that performance on time is a condition of the other party's duty, this condition can be waived by a mere expression of willingness by that other party; an 'extension of time' is such a waiver.[49] "

In footnote 49, the learned author states:

> "Where time of payment is expressly of the essence, the condition may readily be held to be waived or eliminated if the vendor makes payment on time difficult or if he is himself not ready to convey. *Zempel v. Hughes*, 85 N.E. 641, 235 Ill. 424 (1908).
>
> "The 'waiver' does not have to be in writing, even though the contract is within the statute of frauds and is in writing. * * * An oral agreement fixing a new date for performance would not be enforceable as a contract; but it may nevertheless prevent the vendor from defending on the ground that payment was not on time. The discussion in *Garbis v. Weistock*, 51 A. 2d 154, 187 Md. 549 (1947), is somewhat confused; but the decision is sustainable if the trial court found that the defendant had never in fact 'waived' the condition." [3]

The Kimms alleged in their answer to the bill of complaint that, at the time the Andrews contract was entered into, the prior contract of December 10, 1970, was in effect and the Kimms "were ready, willing and able to settle under the

---

**3.** We have carefully considered the opinion of our predecessors in Garbis v. Weistock, 187 Md. 549, 51 A. 2d 154 (1947) referred to in footnote 49 by Professor Corbin. It is clear to us that the dicta in the case that Professor Corbin finds to be "somewhat confused" must be read in connection with the holding that the chancellor in that case was not clearly in error in determining that the evidence failed to establish a waiver of the time element in the contract. *See* 187 Md. at 559, 51 A. 2d at 158.

terms of the existing Contract." This allegation was amply supported by the proof. The Kimms had arranged well in advance of March 31, 1971, to have the title to the subject property examined and they had arranged to withdraw from their bank the funds necessary to complete the settlement on March 30, 1971, if there had been compliance by the Dicuses with Condition No. 4. We think these allegations and facts bring the present case well within our decision in *Evelyn v. Raven Realty, Inc.*, 215 Md. 467, 138 A. 2d 898 (1958).

In *Evelyn*, Judge Horney, for the Court, stated:

> "When a seller has promised to convey land on the express condition that payment of the purchase price must be made on or before a specified date, payment on time is the condition which a buyer must perform. But, if the seller merely states to the buyer that he does not insist on timely payment, he thereby eliminates the condition, and such statement constitutes a 'waiver'. Being the seller's voluntary action, it is not necessary for the buyer to give any consideration for the waiver, or that the buyer change his position, in reliance thereon, in order for the waiver to be legally effective. If, however, the seller foresees or should have foreseen that the buyer would materially change his position in reliance on the waiver, and the buyer does so, then the seller is 'estopped'. The seller's action is still a 'waiver', but the resulting action in reliance thereon by the buyer creates the 'estoppel'. Thus, 'waiver' consists of the voluntary action of the seller alone, while an 'estoppel' requires the action of both the seller and the buyer."
> 215 Md. at 472, 138 A. 2d at 900.

The court later stated that the bill of complaint for specific performance instituted by the buyer should have been dismissed because the buyer had neither alleged nor proved that he was ready, willing and able to perform within the time limit in the contract. As we have noted, there were

sufficient allegations and proof of that element in the instant case.

The evidence also indicates that Mrs. Lewis, acting on behalf of the Kimms, proposed to Mr. Wagonheim, attorney for the Dicuses, on March 31, 1971 (April 1, 1971, to Mr. Wagonheim's best recollection), that settlement with the Dicuses would be held on Monday, April 5, 1971, if the Dicuses would agree that $1,000 be held in escrow at the settlement to insure that Mr. Dicus would show the boundaries of the subject property to the Kimms within three months. Mr. Wagonheim communicated this proposed arrangement to the Dicuses and thereafter submitted a counterproposal, the terms of which are mentioned earlier in the opinion. This counterproposal was accepted by the Kimms on April 2 or 3; and Mrs. Lewis communicated this acceptance to Mr. Wagonheim on Saturday, April 3, 1971, who said "fine."

Mr. Wagonheim testified that he did not have actual authority to bind the Dicuses to this arrangement which he made on their behalf. In our opinion, however, he had apparent authority to do this, the Dicuses having held him out as having such authority. *See Hobdey v. Wilkinson,* 201 Md. 517, 94 A. 2d 625 (1953); Restatement (Second) of Agency § 8 (1957).

It is clear that the Dicuses continued to recognize the contract of December 10, 1970, as mutually valid and operative subsequent to March 31, 1971; and, indeed, they *actually settled* under that contract on May 4, 1971.

In 3A Corbin on Contracts § 754, at 489 (1960), it is stated:

> "Even though the contract expressly declares that nonpayment on time shall automatically terminate all rights of the obligor . . . such a provision will not be enforced if the creditor has in any way contributed to the default or has in any way indicated that he will not insist upon the forfeiture."

And at 491:

> "In any case, the continued recognition of the

contract as mutually valid and operative will prevent the obligee from asserting the obligor's existing default as a complete discharge of his own obligation.[10] "

In footnote 10, Professor Corbin states:

"Recognition of the continuance of the contract and a waiver of the condition of payment on time are evidenced by the creditor's continuing to demand payment, by silence in the face of a request for an extension, by negotiating for a repurchase *or other settlement,* and in many other ways." (Emphasis supplied.)

*See Shoreham Developers, Inc. v. Randolph Hills, Inc.,* 248 Md. 267, 235 A. 2d 735 (1967), *supra; Lissau v. Smith,* 215 Md. 538, 138 A. 2d 381 (1958). *See also Warner Co. v. MacMullen,* 381 Pa. 22, 112 A. 2d 74 (1955); *DeMatteo Construction Co. v. Daggett,* 341 Mass. 252, 168 N.E.2d 276 (1960).

In our opinion, Andrews, who is in privity with the Dicuses and who is not a bona fide purchaser without notice, cannot assert the Statute of Frauds against the Kimms in this case in regard to the waiver of the "time is of the essence" provision inasmuch as the Dicuses, themselves, could not assert it.

The rights of Andrews, if any, are, at the most, derivative from those of the Dicuses; and, as we have seen, they had no right to assert the Statute of Frauds against the Kimms in regard to the oral waiver of the "time is of the essence" provision of the contract of December 10. Hence, Andrews likewise has no right to assert the statute against the Kimms, claiming as he does under and through the Dicuses.

The chancellor in reaching a contrary conclusion relied upon the cases of *VanCloostere v. Logan,* 149 Ill. 588, 36 N. E. 946 (1894); *Gohlke v. Davis,* 279 S.W.2d 369 (Tex. Civ. App. 1955) and *O'Banion v. Paradiso* 39 Cal, Rptr. 370, 393 P. 2d 682 (1964). In our opinion, these cases are distinguishable from the present case since, in each of the

cases, the *first contract* was *unenforceable* as violative of the Statute of Frauds. In the instant case, the first contract was fully enforceable and, indeed, the parties to that contract actually performed under it by going to settlement on May 4, 1971.

> *Decree of September 22, 1972, reversed and the case is remanded to the lower court for the entry of a decree dismissing the bill of complaint, with prejudice, and requiring the plaintiff, Michael W. Andrews (appellee in this Court) to pay the costs; the costs in this Court also to be paid by the appellee.*