710 A.2d 298

**FREDERICK ROAD LIMITED PARTNERSHIP et al.**

v.

**BROWN & STURM et al.**

No. 297, Sept. Term, 1997.

Court of Special Appeals of Maryland.

Jan. 8, 1998.

Reconsideration Denied June 24, 1998.

Albert D. Brault, Rockville (Joesph P. Morra and Brault, Graham, Scott & Brault, Rockville, H. Thomas Howell, William F. Gately, Timothy M. Gunning and Howell, Gately, Whitney & Carter, L.L.P., Towson, on the brief), for Appellants.

Charles E. Iliff, Jr., Baltimore (Stephan Y. Brennan and Iliff & Meredith, P.C., Baltimore, Philip J. McNutt, Rockville, on the brief), for Appellees.

Argued before DAVIS, HOLLANDER and KENNEY, JJ.

HOLLANDER, Judge.

This case concerns the timeliness of a suit instituted by Frederick Road Limited Partnership and Fannie Lois Aschenbach, appellants, in the Circuit Court for Montgomery County. On May 25, 1995, some seven years after reaching a final settlement with the Internal Revenue Service ("IRS") concerning tax deficiencies, appellants sued Brown & Sturm, R. Edwin Brown, P.A., The Peach Tree Road Investment Co.,[1] R. Edwin Brown, Esquire, Rex L. Sturm, P.A., and Rex L. Sturm, Esquire, appellees, for legal malpractice, fraud, civil conspiracy, breach of fiduciary duty, and aiding and abetting.[2]

---

1. The Peach Tree Road Investment Co. was at one time the corporate title of R. Edwin Brown, P.A. At the time suit was filed, Peach Tree Road Investment Co. had forfeited its charter.

2. August C. Bonsall, CPA, P.A. and August C. Bonsall, a certified public accountant, were also named as defendants in this action. On September 12, 1996, the court granted their motion for summary judgment and dismissed appellants' claims against them. Appellants do not appeal from that order.

Appellants also brought an equitable claim seeking rescission of the parties' retainer agreement and an addendum thereto. Based on the statute of limitations and laches, the trial court granted appellees' motion for summary judgment.

Appellants timely noted their appeal and present the following questions for our review, which we have combined, reordered, and rephrased.

I. Were there genuine disputes of material fact regarding when appellants knew or should have known of the alleged attorney malpractice?

II. Were there genuine disputes of material fact regarding whether a diligent investigation would have led to appellants' discovery of the alleged malpractice?

III. Does counsel's "continuous representation" of appellants toll the limitations period?

IV. Did the court err in granting summary judgment on the rescission count based on laches?

For the reasons discussed below, we conclude that the court properly granted summary judgment. Therefore, we shall affirm.

## Factual Background

This case centers on the disposition of 437 valuable acres of land (the "King Farm") located in Montgomery County. We shall set forth the facts essentially as alleged by appellants.

In 1981, W. Lawson King ("King") and his wife, Cordelia E. King ("Mrs.King") (collectively "the Kings"), the owners of the King Farm, decided to convey their property to their three children ("the King children"), one of whom is appellant Fannie Lois Aschenbach.[3] To minimize the tax consequences of the conveyance, the Kings initially engaged the services of R. Edwin Brown, Esquire, and August C. Bonsall, Mr. King's accountant, rather than their long-time friend and attorney, G.

---

3. The other King children are not parties to this action.

Van Velsor Wolf ("Wolf"), who was then a partner at the law firm of Piper & Marbury ("Piper").

Bonsall believed the fair market value of the King Farm, at its highest and best use, was between $20 million and $100 million. Nevertheless, Brown procured three appraisals of the King Farm, each of which valued the property for agricultural use. These agricultural use appraisals valued the King Farm at between $515,000.00 and $720,000.00. Brown also recommended that, in order to justify the sales price, the Kings should place a three-year agricultural easement on the property.

In September 1981, Bonsall spoke to Stanard T. Klinefelter, Esquire, then an associate at Piper, and explained the proposed sale of the King Farm based on a "farm use only" appraisal. Klinefelter told Bonsall that the three-year agricultural easement would not justify the "farm use only" valuation, the sale would incur federal gift taxes, and the plan was "badly flawed in terms of estate planning." Klinefelter also spoke to Wolf and other attorneys at Piper, who researched different options for the King Farm transfer.

On November 11, 1981, Wolf, who had by then retired from Piper, and Klinefelter traveled to King's office in Gaithersburg, where Wolf met with King and Bonsall to discuss Piper's recommendations for transfer options. Klinefelter did not participate in the actual meeting. Wolf recommended a charitable lead trust to King as the most advantageous estate-planning vehicle and, initially, King authorized Piper to prepare such a trust for his consideration. On January 4, 1982, Wolf, Bonsall, Klinefelter, and other attorneys from Piper met in Baltimore to discuss the charitable lead trust plan.

Ultimately, the Kings decided to proceed with Brown's proposal, after it was revised to include a five-year agricultural easement on the property. On February 5, 1982, the Kings and the King children executed the sales contract, which provided that the sale price would be the average of the three independent appraisals. Prior to and after execution of the

contract, Bonsall sent letters to King and the King children discussing potential federal tax consequences of the sale. Although these letters sparked concerns among the King children, Brown assured the King children that the transaction would not result in any adverse tax consequences. At the closing on March 3, 1982, the Kings executed a deed, transferring approximately 417 acres of the King Farm to two limited partnerships created by the King children: (1) Frederick Road Limited Partnership, for which appellant Aschenbach served as general partner, and (2) Field Farms Limited Partnership, for which the Kings' other two children served as general partners. The King children created the limited partnerships with the assistance of independent legal counsel. The total sale price was $596,542.95, representing the average of the three appraisals.

The Piper attorneys were surprised to learn of the sale, prompting a letter from Klinefelter to Bonsall shortly after the deed was executed. In the letter, Klinefelter renewed his concerns about the tax consequences of the transaction. Bonsall never responded.

In May 1982, Wolf met with King and King's son, William, and again expressed his concern about the tax consequences of the conveyance. Later, during a meeting between Wolf and Brown, King contacted Brown and told him to cancel the sale. Wolf then met with the King children and explained his concerns about the tax consequences, stating that the sale "will never fly" with the IRS. Nevertheless, Brown continued to assure the King family that "the transaction was legitimate, would not result in any adverse tax consequences to the family, and could be defended before the IRS."

In June 1982, King discharged Wolf and Piper as his attorneys. In reply, on June 30, 1982, Wolf wrote a lengthy letter to King, with a copy to Brown, expressing concern about the potential adverse tax consequences of the transaction. Wolf also said that, as he had retired from the practice of law, his work for King had been performed "entirely out of friend-

ship and ... long held affection for [King]." Further, Wolf stated, in part:

[A]s of the present moment I either know or have every reason to believe that the property you recently transferred to your children for $566,434.13 did not have a "fair market value"—which is the test under all three of the federal tax laws, to wit, income, gift and estate—of that amount or anywhere near it. On the contrary, ... the true value of that land for federal estate tax purposes is far, far in excess of $1,500 an acre.

I have been advised by a very knowledgeable, experienced and responsible person who is wholly familiar with the property ... that at the very least the "home farm" as transferred to the children is worth $1.50 a square foot or $65,340 an acre. That is, for 418 acres the minimum federal income tax valuation might well be in the neighborhood of $27,312,000.

\* \* \* \*

According to our figures if the Internal Revenue Service should use what I was advised to be a "realistic" value of the property per acre, that is $3.00 per square foot, or a total of $54,624,240, the federal gift tax which you and Mrs. King would have to come up with would be approximately $33,943,000 in cash....

\* \* \* \*

The trouble here is that according to my records there is presently no way in which you and Mrs. King could produce that kind of tax money (not counting the possible penalties and interest ... that could be added on to the tax if there were a late payment), since your principal asset, the "home farm," has as of the moment been transferred presumably irrevocably to the children.

After they became aware of Wolf's letter, the King children again met with Brown to discuss Wolf's concerns. Brown unequivocally assured the King children that the transaction

was legitimate. Consequently, in December 1982, the Kings conveyed the remaining 20–acre homestead to their children for a stated consideration of $248,100, again based on an agricultural appraisal.

Mrs. King died in 1983 and Mr. King died in 1985. Shortly thereafter, the IRS began to investigate the transfer of the King Farm. Ultimately, on August 28, 1987, the IRS issued deficiency assessments against the estates of the Kings, as well as to the King children, totaling more than $68 million in taxes and penalties. Brown again advised the King children that the transaction was legitimate and that the IRS controversy could be resolved without the payment of additional taxes. Brown & Sturm continued their representation of the King children in federal tax court, based on a reverse contingency fee arrangement.[4]

In December 1988, two weeks before the scheduled trial in tax court, Brown advised the King children that they should settle the case for $20 million. Brown's alleged reason for this turnabout was his discovery that the IRS files contained a copy of Wolf's letter to King of June 30, 1982, and Brown felt this compromised all of their defenses. Later that month, the King children settled the tax case for $20 million; $10 million was allocated to taxes and $10 million was allocated to interest. The settlement also resulted in $4.8 million in legal fees owed by the King children to Brown & Sturm under the reverse contingency fee arrangement. On March 2, 1989, the parties executed an addendum to the retainer agreement, by which the King children agreed to pay 10% per annum interest to defer the fee that was due to appellees.

Claiming that Wolf's disclosure of the letter of June 30, 1982 to the IRS was the sole reason that the King children were forced to settle their tax claim for $20 million, Brown & Sturm

---

4. Under the terms of this arrangement, the King children agreed to pay appellees ten percent of the difference between the deficiency assessment and penalties and the amount of taxes that were ultimately paid, if any. In addition, the King children agreed to pay appellees five percent of any reduction in penalties assessed for alleged fraud.

recommended that the King children institute a malpractice claim against Wolf and Piper for releasing the letter to the IRS. Because Brown would be a potential witness in the malpractice case, appellees recommended that the King children engage Bayard Z. Hochberg, Esquire, to represent the King children against Wolf and Piper. Subsequently, the King children retained Hochberg and filed a malpractice suit against Wolf and Piper in the Circuit Court for Montgomery County.

On May 3, 1991, during the litigation against Wolf and Piper, Hochberg received a letter from Wolf's attorney that stated:

> If the children have any remedy in this case, it is against Mr. Brown. We believe that he counseled Lawson King to make bargain sales and we are aware that he represent the King Estates and the three children in the Tax Court proceedings. We suggest further that, if the children wish to pursue this matter, they look in Mr. Brown's direction.

On October 21, 1992, the court (Messitte, J.) granted the motion for summary judgment filed on behalf of Wolf, who died during the pendency of the litigation, and Piper. Thereafter, an appeal was brought by William I. King and Elizabeth Jeanne Jacobs, the other two King children, as well as representatives of the Kings' estates and the trustees under trusts created by the Last Will and Testament of W. Lawson King and the Last Will and Testament of Cordelia E. King. Appellants in the case *sub judice* did not participate in the appeal. We affirmed. *King v. Piper & Marbury*, 97 Md.App. 761 (1993).

Appellants allege here that it was only when they read Judge Messitte's opinion that they discovered appellees' malpractice. Subsequently, appellants discharged Brown & Sturm as their attorneys and, on May 25, 1995, they filed the law suit now at issue.

In an order filed March 7, 1997, the circuit court (Chapin, J.) granted appellees' motion for summary judgment on all counts, based on the statute of limitations and laches. The

court's ruling followed a hearing on March 6, 1997, at which the court orally found that the following facts were undisputed:

1. The contract of sale utilizing the agricultural use value was executed on February 5, 1982, in Brown's office;

2. Brown assured the King family that they were doing something that would be advantageous to the family;

3. At no time did Brown, Sturm or anyone else ever advise the family that there would be an enormous tax consequence arising out of the structure of the transaction;

4. Shortly after the contract of sale was executed, Bonsall sent letters to the King children equivocally suggesting the existence of possible tax consequences;

5. When these letters occasioned inquiry from the King children, Brown assured them that the sales transaction was appropriate and would not result in any adverse tax consequences;

6. Thereafter, the sales contract proceeded to closing in Brown's office, with execution of the deed on March 5, 1982;

7. At no time during these events did Bonsall or Brown advise the King family that the transaction should not proceed as structured or that it would result in adverse estate or gift tax consequences;

8. Wolf had been an attorney with Piper and had previously represented certain members of the King family, corresponded with the King children, and met personally with them about the adverse consequences of the sales transaction;

9. In a subsequent conversation, Brown reassured William King and other members of the King family that the transaction was legitimate, would not result in any adverse tax consequences to the family, and could be defended before the IRS;

10. In July and August 1987, the IRS issued deficiency assessments against the Kings' estates and the King

children as donees, totaling over $68 million in taxes and penalties. Moreover, the King children were personal recipients of the assessment notices at that time;

11. Throughout this period of time, the defendants (appellees herein) frequently represented to the King children, either individually, collectively, or both, that the sale could be successfully defended without any additional tax adjustment;

12. In December 1988, approximately two weeks prior to the commencement of trial in the United States Tax Court, Brown suddenly and without warning advised the King children that they should immediately settle the case for $20 million;

13. Brown & Sturm took no steps in the defense of the tax case to obtain a court ruling on the admissibility of Wolf's testimony or correspondence or of its relevance;

14. Brown & Sturm advised the King children that the Wolf letter totally compromised all of their defenses to the IRS claim and exposed them to substantial fraud penalties.

The court concluded:

[Appellants] necessarily knew at [the] point of final settlement [with the IRS] that the representations and promises made by the [appellees] regarding the avoidance of additional taxes had not and would not ever be realized.

In short, the undisputed facts indicated that [appellants] were or should have been put on notice, at least at that point in time [when they settled with the IRS for $20 million] such that a reasonable person would have made reasonable inquiry as to the cause of the action against [appellees].

We will include additional facts in our discussion.

### Discussion

### I.

Md. Rule 2–501 establishes a two-part test for summary judgment. "In deciding a motion for summary judgment . . .

the trial court must decide whether there is any genuine dispute as to material facts and, if not, whether either party is entitled to judgment as a matter of law." *Bagwell v. Peninsula Regional Medical Ctr.*, 106 Md.App. 470, 488, 665 A.2d 297 (1995), *cert. denied,* 341 Md. 172, 669 A.2d 1360 (1996); *see also Beatty v. Trailmaster Prods., Inc.*, 330 Md. 726, 737–38, 625 A.2d 1005 (1993); *Bits "N" Bytes Computer Supplies, Inc. v. Chesapeake & Potomac Tel. Co.*, 97 Md.App. 557, 576–77, 631 A.2d 485 (1993), *cert. denied,* 333 Md. 385, 635 A.2d 425 (1994); *Seaboard Sur. Co. v. Richard F. Kline, Inc.*, 91 Md.App. 236, 242–45, 603 A.2d 1357 (1992).

In order to defeat the motion for summary judgment, the party opposing the motion must produce evidence demonstrating that the parties genuinely dispute a material fact. *Scroggins v. Dahne,* 335 Md. 688, 691, 645 A.2d 1160 (1994); *Fearnow v. Chesapeake & Potomac Tel. Co.*, 104 Md.App. 1, 49, 655 A.2d 1 (1995), *aff'd. in part and rev'd in part,* 342 Md. 363, 676 A.2d 65 (1996). A material fact is one that "will alter the outcome of the case depending upon how the factfinder resolves the dispute over it." *Bagwell,* 106 Md.App. at 489, 665 A.2d 297; *see also King v. Bankerd,* 303 Md. 98, 111, 492 A.2d 608 (1985). To demonstrate a factual dispute and defeat the motion, the non-moving party must present more than "mere general allegations which do not show facts in detail and with precision." *Beatty,* 330 Md. at 738, 625 A.2d 1005. In this regard, all factual disputes are resolved in favor of the non-moving party. Moreover, all inferences reasonably drawn from the facts must be resolved in favor of the non-moving party. *Tennant v. Shoppers Food Warehouse Md. Corp.*, 115 Md.App. 381, 387, 693 A.2d 370 (1997); *see also Berkey v. Delia,* 287 Md. 302, 304–05, 413 A.2d 170 (1980); *Maloney v. Carling Nat'l Breweries, Inc.*, 52 Md.App. 556, 560–61, 451 A.2d 343 (1982). If there are no disputes of material fact, the trial court may resolve the case as a matter of law. *Fearnow,* 104 Md.App. at 48, 655 A.2d 1.

On review, we must undertake the same analysis as the trial court. Like the trial court, we must determine whether there are any genuine disputes of material fact. *Honaker v. W.C. &*

*A.N. Miller Dev. Co.,* 285 Md. 216, 230–31, 401 A.2d 1013 (1979); *Impala Platinum, Ltd. v. Impala Sales (U.S.A), Inc.,* 283 Md. 296, 326, 389 A.2d 887 (1978). We also review the trial court's decision to determine if it reached the correct legal result. *Beatty,* 330 Md. at 737, 625 A.2d 1005. Appellate courts generally review a grant of summary judgment based "only on the grounds relied upon by the trial court." *Blades v. Woods,* 338 Md. 475, 478, 659 A.2d 872 (1995); *see also Gross v. Sussex,* 332 Md. 247, 254 n. 3, 630 A.2d 1156 (1993); *Hoffman v. United Iron and Metal Co.,* 108 Md.App. 117, 132–33, 671 A.2d 55 (1996).

 In the case *sub judice,* appellants claim that the trial court erred in granting summary judgment in favor of appellees because the question of when appellants knew or should have known of appellees' alleged malpractice and fraud is a disputed material fact. According to appellants, they did not have actual knowledge or inquiry notice of appellees' alleged malpractice and fraud until they read Judge Messitte's opinion of October 21, 1992, and suit was filed on May 25, 1995.

The Court of Appeals explained in *Pennwalt Corp. v. Nasios,* 314 Md. 433, 550 A.2d 1155 (1988):

> Since the question of whether the plaintiffs were on inquiry notice of their cause of action more than three years before filing suit was a question of fact determinative of the limitations defense, the trial court erred in granting summary judgment *unless reasonable [people] could not find otherwise.*

*Id.* at 450, 550 A.2d 1155 (emphasis added). Therefore, the central question before us is whether a reasonable fact finder could find that, before May 25, 1992, appellants lacked actual knowledge or inquiry notice that their tax liability may have been caused by appellees' malpractice and fraud. *See Shah v. HealthPlus, Inc.,* 116 Md.App. 327, 338, 696 A.2d 473 (1997); *Lombardi v. Montgomery County,* 108 Md.App. 695, 710, 673 A.2d 762 (1996). Drawing all reasonable inferences in appellants' favor, we conclude that the trial court correctly determined that appellants' claims were barred by the statute of

limitations and laches. Therefore, it properly disposed of this case by summary judgment.

## II.

Most cases in Maryland are subject to a three-year period of limitations. Maryland Code (1974, 1995 Repl.Vol.), § 5–101 of the Courts and Judicial Proceedings Article ("C.J."). Section 5–101 provides:

A civil action at law shall be filed within three years from the date it accrues unless another provision of the Code provides a different period of time within which an action shall be commenced.

■ The parties in this case do not dispute the applicability of C.J. § 5–101 to malpractice claims. Instead, they vehemently disagree about when appellants' claims accrued. Generally, "[t]he question of when a cause of action accrues is left to judicial determination." *Doe v. Archdiocese of Washington,* 114 Md.App. 169, 177, 689 A.2d 634 (1997) (quoting *Booth Glass Co. v. Huntingfield Corp.,* 304 Md. 615, 619, 500 A.2d 641 (1985)); *see also Poffenberger,* 290 Md. at 633, 431 A.2d 677; *Lombardi,* 108 Md.App. at 711, 673 A.2d 762. On the other hand, if "the viability of a statute of limitations defense hinges on a question of fact ..., the factual question is ordinarily resolved by a jury, rather than by a court." *Doe,* 114 Md.App. at 178, 689 A.2d 634. Depending upon the nature of the assertions with respect to the limitations plea, the determination of whether the action is barred may be one of law, one of fact, or one of law and fact. *Poffenberger v. Risser,* 290 Md. 631, 634, 431 A.2d 677 (1981); *Doe,* 114 Md.App. at 178, 689 A.2d 634; *Lombardi,* 108 Md.App. at 711, 673 A.2d 762. In this case, however, we are amply satisfied that the court properly resolved the question as to when the causes of action accrued.

■ A "cause of action does not accrue until all elements are present, including damages, however trivial." *Doe,* 114 Md.App. at 177, 689 A.2d 634; *see also Mattingly v. Hopkins,* 254 Md. 88, 95, 253 A.2d 904 (1969); *Baker, Watts & Co. v.*

*Miles & Stockbridge,* 95 Md.App. 145, 187, 620 A.2d 356 (1993); *American Home Assurance v. Osbourn,* 47 Md.App. 73, 86, 422 A.2d 8 (1980). Historically, for purposes of the statute of limitations, a cause of action was deemed to accrue when the wrong occurred. *Hahn v. Claybrook,* 130 Md. 179, 182, 100 A. 83 (1917); *Doe,* 114 Md.App. at 176, 689 A.2d 634. This rule barred recovery for any injuries that were not discovered until after the limitations period; it "made no distinction between a 'blamelessly ignorant' plaintiff and a plaintiff who had 'slumbered on his rights.'" *Doe,* 114 Md. App. at 177, 689 A.2d 634.

The Court of Appeals tempered the harshness of this "date of wrong" rule by adopting the discovery rule, "by which the action is deemed to accrue on the date when the plaintiff knew or, with due diligence, reasonably should have known of the wrong." *Id.; see also Doe v. Maskell,* 342 Md. 684, 690, 679 A.2d 1087 (1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 770, 136 L.Ed.2d 716 (1997); *Edmonds v. Cytology Servs. of Md. Inc.,* 111 Md.App. 233, 244, 681 A.2d 546 (1996), *aff'd sub nom. Rivera v. Edmonds,* 347 Md. 208, 699 A.2d 1194 (1997). Although first applied to medical malpractice cases, *see Hahn,* 130 Md. at 187, 100 A. 83, the discovery rule has been expanded to apply to other professional malpractice actions, including legal malpractice. *See Mumford v. Staton, Whaley & Price,* 254 Md. 697, 714, 255 A.2d 359 (1969). In 1981, the Court of Appeals extended the discovery rule to all civil suits. *See Poffenberger,* 290 Md. at 637, 431 A.2d 677.

To activate the limitations period under the discovery rule, it is not necessary that a plaintiff have actual knowledge of the alleged wrong. This is because actual knowledge encompasses a duty to inquire. The Court explained in *Poffenberger* that a claim accrues when a plaintiff has

actual knowledge—that is express cognition, or awareness implied from "knowledge of circumstances which ought to have put a person of ordinary prudence on inquiry [thus, charging the individual] with notice of all facts which such an investigation would in all probability have disclosed if it had been properly pursued. In other words, a [plaintiff]

cannot fail to investigate when the propriety of the investigation is naturally suggested by circumstances known to [the plaintiff]; and if [the plaintiff] neglects to make such inquiry, [the plaintiff] must suffer from [the plaintiff's] neglect."

*Poffenberger,* 290 Md. at 637, 431 A.2d 677 (quoting *Fertitta v. Bay Shore Dev. Corp.,* 252 Md. 393, 402, 250 A.2d 69 (1969)).

■ It is clear, then, that the limitations period begins to run "when the potential plaintiff is on inquiry notice of such facts and circumstances that would 'prompt a reasonable person to inquire further.' " *Doe,* 114 Md.App. at 188, 689 A.2d 634 (quoting *Pennwalt,* 314 Md. at 447, 550 A.2d 1155). What we said in *Doe* is particularly apt here:

Once on notice of one cause of action, a potential plaintiff is charged with responsibility for investigating, within the limitations period, all potential claims and all potential defendants with regard to the injury. The Court of Appeals has held that "knowledge of the identity of a particular defendant is not a necessary element to trigger the running of the statute of limitations."

*Id.* at 188–89, 689 A.2d 634 (quoting *Conaway v. State,* 90 Md.App. 234, 253, 600 A.2d 1133 (1992)).

■ As we consider the parties' contentions as to accrual, we are mindful that statutes of limitations serve the twin goals of providing an adequate period of time for a diligent plaintiff to bring suit and ensuring fairness to a defendant by precluding the filing of stale claims. *Hecht v. Resolution Trust Corp.,* 333 Md. 324, 338, 635 A.2d 394 (1994); *Doe,* 114 Md.App. at 176, 689 A.2d 634. What the Court said in *McMahan v. Dorchester Fertilizer Co.,* 184 Md. 155, 159–60, 40 A.2d 313 (1944), is pertinent here:

Statutes of limitations are remedial legislation and rest upon sound public policy, for they are enacted to afford protection against stale claims after a lapse of time which ought to be sufficient for a person of ordinary diligence, and after which the defendant might be placed at a disadvantage by reason of long delay. By requiring persons to seek redress by

actions at law within a reasonable time, the Legislature imposes a salutary vigilance and puts an end to litigation. Accordingly, the Courts should refuse to give statutes of limitations a strained construction to evade their effect.

■ Moreover, because the discovery rule is a court-made rule, the Court of Appeals retains "the power to shape the contours" of the rule. *Maskell,* 342 Md. at 691, 679 A.2d 1087. Therefore, "[i]n making a determination as to when the statute of limitations accrues in a particular circumstance, a court must do so 'with awareness of the policy considerations unique to each situation.'" *Doe,* 114 Md.App. at 178, 689 A.2d 634 (quoting *Hecht,* 333 Md. at 338, 635 A.2d 394).

### III.

As we suggested earlier, we must consider when appellants knew or should have known that appellees' conduct constituted an actionable "wrong." *See Doe,* 114 Md.App. at 179, 689 A.2d 634. Appellants assert that the discovery rule tolled the statute of limitations; they urge that reasonable persons would not have been placed on inquiry notice until Judge Messitte issued his opinion dismissing the malpractice suit against Wolf and Piper. Yet they cite no cases for the proposition that a judicial opinion that "suggests" a party's prior attorneys may have committed malpractice establishes that a diligent investigation would not have uncovered the alleged wrongs earlier. Further, they contend that the inquiry notice rule requires that " 'an investigation prompted by notice must lead to discovery of the alleged tort.'" Appellants' Br. at 27 (quoting *Pennwalt,* 314 Md. at 452, 550 A.2d 1155). Because they were diligent in retaining Hochberg, and he apparently did not opine that appellees were negligent, appellants assert that they cannot be faulted for failing earlier to discover their claims.[5] Therefore, appellants contend that there are genuine issues of fact as to whether they were

---

**5.** We shall discuss appellants' contentions as to Hochberg and the import of Judge Messitte's opinion in more detail in Parts IV and V, *infra.*

diligent, and whether a diligent investigation would have led to the discovery of the wrongs alleged here.

We recognize that in *O'Hara v. Kovens,* 305 Md. 280, 503 A.2d 1313 (1986), the Court said that "whether or not the plaintiff's failure to discover his cause of action was due to failure on his part to use due diligence, or to the fact that defendant so concealed the wrong that plaintiff was unable to discover it by the exercise of due diligence, is *ordinarily* a question of fact for the jury." *Id.* at 294–95, 503 A.2d 1313 (internal quotations omitted) (emphasis added); *see also Herring v. Offutt,* 266 Md. 593, 599, 295 A.2d 876 (1972). In our view, however, there were no material facts for a jury to resolve. Appellants' position is completely implausible based on the undisputed facts and the inquiry notice standard that is applicable here.

Although appellants asserted numerous claims in the underlying suit, they are all predicated upon appellees' actions beginning in the early 1980s and ending with their recommendation that the King children should pursue a legal malpractice suit against Wolf and Piper. While the record is not precise as to when appellees recommended a suit against Wolf and Piper, it certainly occurred by August 26, 1990, when appellants signed a letter retaining Hochberg to represent them in that action.

Appellants asserted below that they relied on appellees' legal advice and were repeatedly assured by their attorneys that "they could handle the situation . . . and that there was nothing to worry about." Although appellants contended that they did not know of appellees' wrongs when they hired Hochberg, that contention flies in the face of many other uncontroverted facts. Indeed, the facts that comprise the foundation of appellants' claims against appellees were known by appellants more than three years before they filed suit against appellees on May 25, 1995.

The historical framework is very important here. Appellants seem to suggest that they were misled because their attorneys blamed Wolf and Piper for appellants' problems.

Yet, as early as 1982, appellants were aware of conflicting opinions regarding the legality of appellees' proposed disposition of the King Farm and the potential tax consequences based on the use of an agricultural value rather than the highest and best use. Appellants chose to disregard the advice of Wolf and Piper. Instead, based on appellees' advice, they elected to pursue a course that they thought would result in a huge tax savings. Ultimately, that advice generated an enormous tax liability that culminated, in 1988, in a settlement with the IRS for the rather substantial sum of $20 million.[6] Appellants thus cannot reasonably overlook or ignore that, almost from day one, they were alerted by a highly regarded estates and trusts attorney and a reputable law firm that the validity of appellees' tax planning was questionable.

Appellants also assert that appellees convinced them to settle with the IRS because Wolf's letter of June 1982 had been furnished to the IRS, thereby damaging the viability of appellants' defense to the IRS claim. Again, in light of the history of the case, appellants' position is perplexing. If Wolf's analysis were incorrect and the transaction was legitimate, as appellees advised, then a reasonable person should have wondered why appellees would fear the compromise of the defense based on a letter that was legally incorrect. Stated otherwise, if Wolf's view was wrong, as appellees had maintained, Wolf's letter should not have made a difference in defending what was cast by appellees as a legitimate transaction. Conversely, because Wolf's letter was of concern, that, too, should have alerted appellants.

At the very least, knowing of Wolf's legal position, coupled with the costly settlement with the IRS in 1988, appellants must have, and certainly should have, considered the quality of appellees' advice. Indeed, the trial court said: "The undisputed facts indicated that [appellants] were or should have been put on notice, at least at that point in time, such that a

---

**6.** The dissent correctly observes: "This case captures the spirit of the adage that if something appears too good to be true, it probably is." We agree; that is precisely why appellants' claims are barred.

reasonable person would have made reasonable inquiry as to the cause of action against [appellees]. *No reasonable jury in my view could find otherwise.*" (Emphasis added). The size of the settlement is also a factor of some significance here. We recognize that, for any number of reasons, many cases are settled by payment from a party who is not necessarily culpable, or who does not believe he or she is actually liable. A $20 million settlement, however, is not of the kind or amount that is ordinarily paid without some genuine concern as to liability or wrongdoing. A settlement of that magnitude surely should have signaled to appellants that something may have been wrong with the underlying advice from appellees.

*Leonhart v. Atkinson,* 265 Md. 219, 289 A.2d 1 (1972), and *Feldman v. Granger,* 255 Md. 288, 257 A.2d 421 (1969), are instructive here. In both cases, the clients of accountants brought suits alleging professional malpractice that resulted in assessments of penalties and interest by the IRS. In each case, the client contested the IRS assessment and the Court of Appeals held that the statute of limitations for the clients' claims accrued when the IRS issued deficiencies. *See Leonhart,* 265 Md. at 225, 289 A.2d 1; *Feldman,* 255 Md. at 296, 257 A.2d 421. Moreover, the Court in *Leonhart* was unmoved by the fact that, "after [the appellee-accountant] advised [the appellant-client], [appellee] continually maintained his position and recommended that the matter be pursued in the tax court." *Leonhart,* 265 Md. at 228, 289 A.2d 1. Neither *Leonhart* nor *Feldman* precludes finding that a malpractice action against tax advisors accrues prior to receipt of a tax deficiency notice. At the very least, the date of accrual ordinarily would not occur *after* receipt of such notice. *See Edwards v. Demedis,* 118 Md.App. 541, 552, 703 A.2d 240 (1997).

Appellants contend that *Leonhart* and *Feldman* no longer constitute good law. Instead, appellants rely on *Prande v. Bell,* 105 Md.App. 636, 660 A.2d 1055 (1995), and assert that "the question of whether a plaintiff was on notice of a [legal malpractice] cause of action is a question of fact," *id.* at 659,

660 A.2d 1055, making summary judgment inappropriate. Appellants' reliance on *Prande* is misplaced.

In *Prande,* the plaintiff had retained the defendant law firm to represent her in two automobile accident cases. On advice of her defendant-attorney, she settled the first case in 1990 and the second case in 1992. In her deposition, plaintiff stated that her attorneys told her that she " 'would have to take that money in order for use to go on with the second [accident] case.' " 105 Md.App. at 660, 660 A.2d 1055. She also stated that her attorneys told her that she " '*could recover* [*her* ] *uncompensated damages in the* [*second* ] *litigation.*' " *Id.* at 661, 660 A.2d 1055. Yet the amount recovered in the second settlement was far less than the amount of plaintiff's medical bills. After the second settlement, plaintiff consulted with another lawyer, who informed her of a possible legal malpractice claim against her original attorneys.

In 1994, plaintiff filed her malpractice claim against her former attorneys. One of the attorneys, who had left the law partnership in the period between the two settlements, pleaded the statute of limitations as a defense to the suit, based on the fact that the first settlement occurred in 1990. Plaintiff argued that the discovery rule tolled the limitations period as to the first settlement, because she did not become aware of the harm until 1992, following the second settlement and her consultation with an outside attorney. We held that a genuine issue of fact existed as to whether the plaintiff "knew or had knowledge in 1990, when she settled the [first] case, of circumstances which would cause a reasonable person in her position to undertake an investigation which, if pursued with reasonable diligence, would have led to knowledge of the alleged legal malpractice." *Id.* at 661, 660 A.2d 1055 (internal quotations omitted).

There are significant and obvious differences between *Prande* and the case *sub judice.* In *Prande,* a factual dispute existed as to whether plaintiff knew or should have known that she had suffered damages due to legal malpractice when she was advised to settle the first suit in 1990. Prande had not

been told by any attorney, prior to her second settlement, that her claim was not as valuable as she thought. Moreover it was not until the second settlement in 1992 that Prande realized that she had not fared well as to her total monetary recovery. Perhaps most important, she then sued her former attorneys by 1994.

In contrast, appellants settled with the IRS in 1988, incurring a tax liability of $20 million. If nothing else, the settlement should have reminded appellants of the repeated warnings and predictions of Wolf and Piper that appellees' tax scheme was flawed and that it would subject appellees to additional taxes and penalties. Indeed, it is inconceivable that a reasonable person, at that point, would not have thought to question appellees' advice, which culminated in a whopping tax liability. Yet appellants waited seven years to bring suit against appellees.

Moreover, unlike in *Prande,* there is no allegation here that appellees advised appellants to settle because they could recover any "uncompensated damages" in a subsequent case. To the contrary, to the extent appellants suffered damages, they were known by the time they settled the tax case with the IRS in 1988,[7] following an intense estate planning effort, in which appellants were specifically advised by Wolf and Piper that the proposed transaction could produce adverse tax consequences.

Appellants also argue: "In this case ... the discovery of a cause of action against an identified third party (Piper & Marbury) did not put [appellants] on notice of different and unsuspected wrongs of their own attorneys in mishandling the tax case. Indeed, by their advice and representations, [appellees] actively sought to conceal their own fraud and malprac-

---

7. We note that, in the malpractice case against Wolf and Piper, Judge Messitte determined, and we later agreed, that appellants' damages in the tax case were impermissibly speculative. *See King v. Piper & Marbury,* slip op. at 16–18. We also observe, however, that the fact that appellants settled their tax case would not necessarily trigger collateral estoppel for purposes of this malpractice action. *See Prande,* 105 Md.App. at 652, 660 A.2d 1055.

tice." The alleged concealment is conclusory, at best. Appellants' assertion is untenable. Certainly, by December 1988, when appellants settled the tax case, they had knowledge of enough facts to prompt them to begin an inquiry. At that point in time, if not before, limitations began to run, regardless of whether appellants had knowledge of the identity of all potential defendants or the precise nature of the harm. *Doe,* 114 Md.App. at 188–89, 689 A.2d 634; *Conaway v. State,* 90 Md.App. 234, 253, 600 A.2d 1133 (1992). As we suggested earlier, appellants ought to have questioned the materiality of the IRS's possession of Wolf's letter, given appellees' insistence at the outset that Wolf's advice was incorrect and his concerns were unfounded. Appellees' recommendation to settle with the IRS was almost a complete about-face; when appellees advised appellants to settle because the IRS obtained Wolf's letter, it was reasonable for appellants to consider whether appellees had realized that Wolf was probably right, regardless of appellees' protestations to the contrary.

As we noted, by August 1990, based upon the advice of appellees, appellants engaged Hochberg to pursue a malpractice claim against Wolf and Piper. The dissent asserts that summary judgment was not appropriate because, inferentially, appellants alleged a basis on which a fact finder could conclude that appellees concealed their alleged negligence from appellants by blaming Wolf and Piper. In recommending that appellants retain Hochberg to sue Wolf and Piper, the dissent suggests that "one could infer appellees created a smoke screen to obscure their own liability." The smoke screen has been created by appellants. It is undisputed that appellants had actual knowledge that appellees' tax advice was questionable, that the IRS had issued deficiency notices, and that the King children had agreed to pay $20 million dollars to settle the IRS suit. Appellants' unwavering faith in appellees notwithstanding, neither appellants nor the dissent directs us to any evidence tending to create a reasonable inference that appellants lacked actual knowledge of the facts comprising their malpractice claim by the time they settled with the IRS in 1988.

Moreover, the affidavits quoted at length by the dissent are conclusory, at best, particularly when considered in light of the uncontroverted facts known to appellants. For example, in view of the $20 million tax settlement, Ms. Aschenbach's assertion that appellees had "assured" her that she had "nothing to worry about" is not enough to lull a reasonable person to slumber on her rights or to overcome her obligation to inquire. Similarly, in his affidavit, Conrad Aschenbach, appellant's husband, asserts that Mr. Brown assured the family that "the transaction was legitimate," it was "a bona fide sale," and that "there would be no adverse tax adjustment." Surely, any belief in these "representations" must have faded once appellants agreed to such a hefty settlement with the IRS. Moreover, we fail to see the relevance of those kinds of assurances, if they were made *before* the IRS settlement. We also cannot ignore that Wolf's attorney, in a letter dated May 3, 1991, notified Hochberg, and thus appellants, of a potential malpractice claim against appellees. *See Williams v. Skyline Dev. Corp.,* 265 Md. 130, 165, 288 A.2d 333 (1972) ("[N]otice to an attorney is notice to his client . . . ."); *see also Kimm v. Andrews,* 270 Md. 601, 621, 313 A.2d 466 (1974); *Fertitta v. Bay Shore Dev. Corp.,* 266 Md. 59, 72–73, 291 A.2d 662 (1972); *Doe v. American Nat'l Red Cross,* 923 F.Supp. 753, 759 (D.Md.1996). As a result, "Such knowledge of [appellants'] cause of action more than three years before [they] sued, if not actually known (connoting legally understood) to [them], was imputable to [them] through [their] counsel as a matter of law." *Johnson v. Nadwodny,* 55 Md.App. 227, 236, 461 A.2d 67 (1983); *see also American Nat'l Red Cross,* 923 F.Supp. at 759.

In sum, construing, as we must, all *reasonable* inferences in favor of appellants, the conclusion is inescapable that the court properly granted summary judgment. Once appellants settled the tax case, they had actual knowledge of sufficient material facts giving rise to their claims against appellees. Appellants' attempt to "shoot the messenger," by filing suit against Wolf and Piper for allegedly exposing appellees' flawed tax strategy, did not toll the statute of limitations. Appellants' reason-

ing as to inquiry notice is plainly flawed; they stretch the discovery rule beyond its breaking point.

## IV.

■ Appellants suggest that, by retaining Hochberg, the statute of limitations was tolled. In essence, they argue that they hired a topflight lawyer to undertake an analysis of their claims, and because he did not recommend a suit against appellees, they could not be charged with a duty to inquire and they did not have notice of their claims. This argument is without merit. "[T]he Court of Appeals recognized ... [that] 'when the statute of limitations once begins to run, nothing will stop or impede its operations.' " *Bennett v. Baskin & Sears,* 77 Md.App. 56, 76, 549 A.2d 393 (1988) (quoting *Walko Corp. v. Burger Chef Sys., Inc.,* 281 Md. 207, 210, 378 A.2d 1100 (1977)). Thus, it is of no moment that appellants knew enough to inquire, but the inquiry did not reveal the claims.[8]

The discovery rule contemplates that a plaintiff has three years after the date of the injury "to investigate further, *obtain expert opinion,* discuss settlement, and file suit." *Lutheran Hospital v. Levy,* 60 Md.App. 227, 238, 482 A.2d 23 (1984) (emphasis added), *cert. denied,* 302 Md. 288, 487 A.2d 292 (1985). "The crucial date is the date the claimant is put on inquiry, not the date an expert concludes there has been malpractice." *Id.* at 240, 482 A.2d 23; *see also Russo v. Ascher,* 76 Md.App. 465, 470, 545 A.2d 714 (1988); *American Nat'l Red Cross,* 923 F.Supp. at 757.

The *O'Hara* Court's analysis is also instructive. There, appellants owned a 30 percent interest in a racetrack. The collective owners of the track had agreed to purchase additional racing dates from another track, and the transfer of dates

---

**8.** We do not suggest that Hochberg was derelict in any way; apparently, he was retained only to sue Wolf and Piper. Assuming, *arguendo,* that he was negligent, because he failed to recommend suit against appellees, this dereliction would not extend the time for appellants to institute suit against the original tortfeasors. It could mean, however, that appellants had an altogether separate claim against Hochberg for alleged malpractice. Any such claim is not before us, however.

was subject to legislative approval. The General Assembly approved the legislation in 1971, but it was vetoed by then-Governor Mandel. In late 1971, after the veto, appellants sold their interest to someone acting as an agent for an undisclosed principal or principals. In early 1972, the Legislature over-rode the Governor's veto. Over the following three years, media attention focused on the sale and disclosed that "close friends of Governor Mandel secretly bought the track at an apparently cut rate." *O'Hara*, 305 Md. at 291, 503 A.2d 1313. One article also commented that "the value of the track had apparently been depressed by the veto of the ... transfer [of racing dates]." *Id.* at 292, 503 A.2d 1313. In November 1975, almost four years after the sale, Mandel and others were indicted for mail fraud with regard to the veto and purchase of the track. Appellants then filed suit against Mandel and others who had been indicted, alleging that, prior to the Governor's veto of the legislation on May 29, 1971, the appel-lees had engaged in a conspiracy to defraud them in the sale of their racetrack interest. Appellees argued that the suit was barred by the statute of limitations, asserting that, as a matter of law, the appellants knew more than three years before filing suit of facts from which they should have discov-ered the alleged fraud.

Writing for the Court, Judge Rodowsky carefully reviewed the statute of limitations defense and the discovery rule, and discussed what it means to be "on notice." He wrote:

Notice is not limited to actual knowledge of the fraud. Nor does it mean discovery of proof, which, if believed, would, in the opinion of counsel, take the case to the jury on the merits. It is not limited to admissible evidence....

\* \* \* \*

"[O]n notice" means having knowledge of circumstances which would cause a reasonable person in the position of the plaintiffs to undertake an investigation which, if pursued with reasonable diligence, would have led to knowledge of the alleged fraud. Further, because the notice must relate to the fraud alleged, notice in this case must relate to the

plaintiffs' claim that a conspiracy within [the group of appellees] antedated the veto.

*O'Hara,* 305 Md. at 301, 503 A.2d 1313. The Court held, however, that the inference could not be drawn, as a matter of law, that, more than three years before filing suit, appellants were on notice of the alleged conspiracy merely because of media attention to the criminal investigation. He noted that the record did not "pin down beyond dispute" that the appellants even had knowledge of the content of the newspaper articles written about the criminal investigation, and it was "debatable how much knowledge a fact finder would infer that a reasonably prudent and diligent former stockholder in [the racetrack], on and prior to [three years before filing suit], would have based on what had been publicly reported." *Id.* at 303, 503 A.2d 1313. Thus, on those facts, the Court held that summary judgment on the basis of limitations was inappropriate.

We are not faced with questions of disputed fact analogous to those that were before the Court in *O'Hara.* In the case at bar, appellants' claims center on the way appellees handled the transfer of the King Farm, the subsequent tax court proceedings, and appellees' advice to sue Wolf and Piper for malpractice. Appellants retained Hochberg to handle the malpractice case against Wolf and Piper, and admit that his investigation was not limited to any one firm or individual. Unlike *O'Hara,* there is no alleged conspiracy between appellees and Hochberg that might give rise to a reasonable inference of concealment.

Perhaps most important, what appellants assert as "fact," for purposes of the statute of limitations, is Judge Messitte's *opinion* about underlying facts and occurrences that were already known to appellants and which formed the basis for the malpractice claim against Wolf and Piper. Those are the identical facts and occurrences at issue here. Judge Messitte's view as to who should bear blame does not alter what was already plainly known to appellants, and his opinion with respect to preexisting facts cannot constitute the date of

accrual of the cause of action against appellees. *See Lutheran Hospital*, 60 Md.App. at 239–40, 482 A.2d 23.

In any event, even if we were to consider Judge Messitte's opinion as an "important fact" for purposes of the discovery rule, it is unreasonable to conclude that what is contained in his opinion could not have been discovered earlier. A diligent investigation surely would have revealed that appellees could have asserted attorney-client privilege in the tax case to block the IRS from using Wolf's letter in the tax litigation, but apparently appellees failed to recognize that legal point. As Judge Messitte stated: "[B]y the *slightest exertion of effort* by Plaintiffs or their counsel, they could have prevented the document from ever coming into evidence in the first place." *King v. Davis*, Civ. No. 82446, slip. op. at 13 (Cir. Ct. Montgomery County, Oct. 21, 1992) (Messitte, J.)(emphasis added), *aff'd sub nom. King v. Piper & Marbury*, No.1939, Sept. Term 1992 (filed Oct. 20, 1993) (per curiam). Indeed, as authority for this proposition, Judge Messitte cited a well known treatise on Maryland evidence law for this proposition—hardly unattainable even with minimal effort.

Moreover, to conclude that Judge Messitte's opinion constituted an "expert opinion" that could not have been obtained through ordinary diligence, thus tolling the statute of limitations, would eviscerate its utility standard. "If we were to adopt appellant[s'] position, a plaintiff 'would be in subjective control of the limitations period.' This would defeat the twin goals of promoting diligent pursuit of viable claims, and allowing repose to defendants when claims have become stale." *Doe*, 114 Md.App. at 183–84, 689 A.2d 634 (citation omitted) (quoting *Travis v. Ziter*, 681 So.2d 1348, 1355 (Ala.1996)). What we said in *Lutheran Hospital* is also apt here:

> Under [appellant's] view, all the historical facts pertaining to an injury could occur, the claimant could be well aware that she had been injured, but no cause of action would accrue until, perhaps decades later, an expert concluded that the ... harm had been the result of malpractice. We do not think the discovery rule countenances that.

*Lutheran Hospital,* 60 Md.App. at 240, 482 A.2d 23; *see also American Nat'l Red Cross,* 923 F.Supp. at 757–58.

## V.

■ Appellants next argue that the trial court failed to attach legal significance to the attorney-client relationship and its effect upon appellants' duty of inquiry. Appellants rely on *Desser v. Woods,* 266 Md. 696, 296 A.2d 586 (1972), for the proposition that appellees had a fiduciary duty to appellants that essentially tolled the statute of limitations. Appellants claim that they were "under [no] duty to make inquiry to discover that the confidential relationship [had] been abused during the continuation of that relationship." *Desser,* 266 Md. at 709, 296 A.2d 586. Nevertheless, appellants acknowledge that the Court also said in *Desser* that:

[i]f the confiding party, . . . is in possession of facts which put such a party upon inquiry which would disclose such an abuse, then the applicable statute of limitations begins to run at the time of receiving . . . facts placing the confiding party upon inquiry; but the burden is upon the trusted party to prove such earlier knowledge.

*Id.* Because we have already concluded that appellants were in possession of facts placing them on inquiry notice of their potential claims more than three years before they filed suit, appellants' fiduciary relationship argument is without merit.

■ Appellants advance the related argument that the statute of limitations was tolled by appellees' "continuous representation" of appellants. They suggest that the continuous representation rule, as applied to attorney malpractice cases in other states, tolls the statute of limitations even when the client has actual knowledge of the attorney's alleged wrongful act or omission. Appellants rely by analogy on the "continuous course of treatment rule," as applied in Maryland to medical malpractice cases,[9] and urge that the principle is

9. The common law continuous representation rule for medical malpractice cases has been abrogated by statute. *See* C.J. § 5–109; *see*

"demonstrably applicable" to the attorney-client relationship, which depends on trust and confidence. *See Hecht,* 333 Md. at 337-38, 635 A.2d 394. Under this rule, appellants contend that their cause of action would not have accrued until appellants terminated their relationship with appellees, and that did not occur until after Judge Messitte issued his opinion in the malpractice case against Wolf and Piper. The dissent also urges that the continuous representation rule applies here. It maintains that the attorney-client relationship should constitute "a factor that a fact finder should be able to consider in determining whether a client has acted reasonably under the circumstances and because of which he may be excused for limited or delayed inquiry."

Appellants and the dissent rely on the following sentence from *Hecht* to support their positions:

> Because of this relationship of trust and reliance, the patient is excused from making inquiry questioning the physician's care.

That sentence, however, must be read in the context of the entire passage. This is what the Court said:

> "[I]f the facts show continuing medical or surgical treatment for a particular illness or condition in the course of which there is malpractice producing or aggravating harm, the cause of action of the patient accrues at the end of the treatment for that particular illness, injury or condition, *unless the patient sooner knew or reasonably should have known of the injury or harm ....*" This continuous course of treatment rule is applied because of the confidential relationship between the physician and the patient. Because of this relationship of trust and reliance, the patient is excused from making inquiry questioning the physician's care.

---

*also Hecht,* 333 Md. at 338 n. 10, 635 A.2d 394; *Hill v. Fitzgerald,* 304 Md. 689, 698, 501 A.2d 27 (1985).

*Id.* at 337–38, 635 A.2d 394 (emphasis added) (citation omitted) (alteration in original) (quoting *Waldman v. Rohrbaugh,* 241 Md. 137, 142, 215 A.2d 825 (1966)).

In our view, the continuous representation rule does not salvage appellants' claims. As we have stated, it is undisputed that appellants knew of the harm involved in this case when they settled the tax case with the IRS. Thus, as we see it, the language that we have italicized from *Hecht* supports our position. What this Court said in *Lutheran Hospital* is also pertinent here:

[L]imitations begin to run when a claimant gains knowledge sufficient to put her on inquiry. As of that date, she is charged with knowledge of facts that would have been disclosed by a reasonably diligent investigation. *The beginning of limitations is not postponed until the end of an additional period deemed reasonable for making the investigation.*

*Lutheran Hospital,* 60 Md.App. at 237, 482 A.2d 23 (emphasis added); *see also O'Hara,* 305 Md. at 288–89, 503 A.2d 1313 (quoting the above passage and observing that in *Lutheran Hospital* this Court correctly applied the discovery rule in the medical malpractice context). *Watson v. Dorsey,* 265 Md. 509, 513, 290 A.2d 530 (1972), is instructive. There, the appellants' legal malpractice claim centered on the attorney's failure to call certain witnesses at an ejectment suit. The attorney asserted a limitations defense. The appellants argued that, because the attorney represented them in the appeal of the ejectment action, the cause of action for malpractice did not accrue until the appeal was completed. The appellants contended that "there was a relationship of trust and confidence between clients and lawyer and that it is unreasonable in this situation to say that the clients should sue the lawyer until the last available court has spoken." *Id.* at 513, 290 A.2d 530. Although the Court acknowledged that there could conceivably be situations in which the client cannot discover the wrong during the continuation of the lawyer-client relationship, such was not the case in *Watson.* The Court said: "The connection between the failure to produce [appellants'] witnesses and the

loss of the case could not have failed to come into their consciousness immediately." *Id.* at 513, 290 A.2d 530; *see also Associated Realty Co. v. Kimmelman,* 19 Md.App. 368, 371–72, 311 A.2d 464 (1973) (refusing to toll limitations for malpractice claim when attorney assured client that trial court's decision would be reversed on appeal). Similarly, the connection here between appellees' legal work and a $20 million tax liability constituted an immediate wake-up call.

It is also significant to us that neither the Legislature nor the Court of Appeals has adopted the continuous representation rule for attorney malpractice cases. Therefore, absent any directive from the Legislature or the Court of Appeals, we decline to apply the rule here. In any event, even if we were to adopt some version of the continuous representation rule as a matter of public policy, we do not believe it would alter the result in this case. The cases on which appellants rely are distinguishable from the case *sub judice.* In each of those cases, the statute of limitations was tolled because either the clients had permitted their attorneys to continue the representation on the same case that gave rise to the alleged malpractice, the client had permitted the attorney to rectify the alleged wrongdoing, or the continued representation rule had been enacted by statute. *See O'Neill v. Tichy,* 19 Cal.App.4th 114, 25 Cal.Rptr.2d 162, 165 (1993)(statutory rule; attorney continued representation during appeal of the case giving rise to malpractice claim); *R.D.H. Communications, Ltd. v. Winston,* 700 A.2d 766, 769 (D.C.App.1997) (attorney attempted to remedy error giving rise to malpractice claim by seeking administrative and judicial reconsideration); *Morrison v. Watkins,* 20 Kan.App.2d 411, 889 P.2d 140, 147 (1995)(attorney continued to serve as trustee of client trust, which served as the basis of client's breach of fiduciary duty claim); *Lima v. Schmidt,* 595 So.2d 624, 631 (La.1992)(attorney took steps to attempt to rectify error); *Maddox v. Burlingame,* 205 Mich. App. 446, 517 N.W.2d 816, 818 (1994)(statutory rule permitted malpractice claim to be filed "within two years of the date the attorney discontinues serving the client"; discovery rule inapplicable), *appeal denied,* 448 Mich. 867, 528 N.W.2d 735 (1995);

*Smith v. Stacy,* 198 W.Va. 498, 482 S.E.2d 115, 123 (1996)(adopting continued representation rule only when attorney continues to provide the same or related services).

In contrast, the settlement of the tax case in 1988 marked the end of the case for which appellees represented appellants. No reasonable jury could conclude otherwise. The only indication that appellees were attempting to conceal their own wrongdoing was by recommending that appellants hire another attorney to sue Wolf and Piper for malpractice. Although appellants urge this Court to consider appellees' role in the malpractice suit against Wolf and Piper as a continuation of appellees' representation, we do not read the rule so broadly. Nor do we believe that the continuous representation rule contemplates tolling the statute of limitations merely because an attorney tries to blame other lawyers. Our conclusion might be different if appellees actually prosecuted appellants' malpractice claim against Piper and Wolf, but that is not the case. It is undisputed that appellees told appellants that they could not act as counsel in the malpractice case against Wolf and Piper because they would be potential witnesses in that case. As a result, appellants retained Hochberg for that purpose. Therefore, appellants' confidential relationship argument has no bearing here.

## VI.

Finally, appellants argue that the trial court erred in granting summary judgment on their rescission count on the grounds of laches. The doctrine of laches applies when there is an unreasonable delay in the assertion of one's rights and that delay results in prejudice to the opposing party. *Inlet Assocs. v. Assateague House Condominium Ass'n,* 313 Md. 413, 438–39, 545 A.2d 1296 (1988); *Hill v. State,* 86 Md.App. 30, 37, 585 A.2d 252 (1991).

When a case involves concurrent legal and equitable remedies, "the applicable statute of limitations for the legal remedy is equally applicable to the equitable one." *Schaeffer v. Anne Arundel County,* 338 Md. 75, 81, 656 A.2d 751 (1995).

Thus, when the statute of limitations bars a party's legal claims, laches will bar analogous equitable claims. *See Fairfax Savings, F.S.B. v. Weinberg & Green,* 112 Md.App. 587, 634 & n. 27, 685 A.2d 1189 (1996); *Villarreal v. Glacken,* 63 Md.App. 114, 127–28, 492 A.2d 328 (1985); *Finch v. Hughes Aircraft,* 57 Md.App. 190, 243, 469 A.2d 867, *cert. denied,* 298 Md. 310, 469 A.2d 864 (1984), *cert. denied,* 469 U.S. 1215, 105 S.Ct. 1190, 84 L.Ed.2d 336 (1985); *see also Shah,* 116 Md.App. at 335, 696 A.2d 473 (stating that when legal and equitable counts are joined "the entire suit must comply with the civil procedures applicable to the more restrictive of the two counts in terms of limitations"). In such circumstances, it is not necessary for a showing of prejudice. *Villarreal,* 63 Md.App. at 128, 492 A.2d 328; *see also Fairfax Savings,* 112 Md.App. at 634 n. 27, 685 A.2d 1189; *Rockshire Civic Assoc. Inc. v. Mayor and Council of Rockville,* 32 Md.App. 22, 28, 358 A.2d 570 (1976).

In their brief, appellants argue that because their retainer agreement with appellees and the addendum were signed under seal, the analogous statute would be the 12–year statute of limitations governing specialties. C.J. § 5–102(a)(5). As this issue was not raised below, we do not consider it here. Md. Rule 8–131(a).

### Conclusion

The undisputed facts compel us to hold, as a matter of law, that appellants were on inquiry notice of the facts and circumstances of their cause of action against appellees well more than three years before they filed suit. Thus, the trial court was correct in its conclusion that appellants' claims were barred by the statute of limitations.

As with appellants' legal claims, we agree with the trial court that appellants' equitable claim should have been brought within three years of appellants being placed on inquiry notice of the facts and circumstances underlying the claim. Therefore, we hold that the trial court was correct in concluding that laches barred appellants' equitable claim for rescission.

Understandably, at oral argument, appellants' able counsel expressed his outrage at the prospect of the judiciary allowing the statute of limitations to prevent members of the legal profession from having to answer for their alleged malpractice. Although we express no opinion as to whether appellees' acts in this case constituted legal malpractice, we point to the existence of the Attorney Grievance Commission and the disciplinary process that applies to the legal profession. *See* Md. Rules 16–701 to 16–718. Disciplinary proceedings under these rules are not barred by limitations. *See Anne Arundel County Bar Ass'n v. Collins,* 272 Md. 578, 583, 325 A.2d 724 (1974); *see also Attorney Grievance Commission v. Owrutsky,* 322 Md. 334, 339, 587 A.2d 511 (1991).

**JUDGMENT AFFIRMED.**

**COSTS TO BE PAID BY APPELLANTS.**

KENNEY, J., dissents.

KENNEY, Judge, dissenting.

This case captures the spirit of the adage that if something appears too good to be true, it probably is.

Initially, it is important to point out that this dissent neither presupposes that appellees have engaged in malpractice or any other alleged wrongdoing nor precludes an ultimate determination that the circumstances surrounding the matters meticulously set out by the majority constitute inquiry notice. It simply reflects my belief that, under the circumstances of this case, the determination of when limitations began could not be made by the trial court pursuant to a motion for summary judgment.

It has been noted that the discovery rule is not a rigid rule. As stated in *Doe v. Archdiocese of Washington,* 114 Md.App. 169, 178, 689 A.2d 634 (1997):

In making a determination as to when the statute of limitations accrues in a particular circumstance, a court must do so 'with awareness of the policy considerations unique to each situation.' ... As we noted, the determina-

tion of when a cause of action accrues under the discovery rule is usually a determination made by the court.... When the viability of a statute of limitations defense hinges on a question of fact, however, the factual question is ordinarily resolved by the jury, rather than by the court.... 'Depending upon the nature of the assertions being made with respect to the limitations plea, th[e] determination [of whether the action is barred] may be solely one of law, solely one of fact or one of law and fact.' [Citations omitted.]

The ultimate issue is whether appellants had such knowledge prior to the dismissal of their suit against Wolf and Piper & Marbury as would cause reasonable people in their position to undertake an additional or more thorough investigation, which, if pursued with reasonable diligence, would have led to an earlier action against appellees for their alleged malpractice and related wrongdoing. As this Court found in *Prande v. Bell*, 105 Md.App. 636, 660 A.2d 1055 (1995), I believe the circumstances surrounding this case generate a question of fact.

Mr. Brown's deposition confirms that his firm maintained a lawyer-client relationship with appellants from 1981 through 1994 in reference to the King Farm.

The affidavit of F. Lois Aschenbach, daughter of W. Lawson King, states:

3. [Appellees] represented me and my siblings without interruption throughout the entire series of events surrounding the transfer of the farm, in the United States Tax Court, and the subsequent law suit against Van Velsor Wolf and Piper & Marbury. I did not terminate my relationship with [appellees] until sometime after Judge Peter J. Messitte issued a written opinion in the law suit against Mr. Wolf and Piper & Marbury. At that time, I refused to participate in an appeal of Judge Messitte's decision, and sought other counsel to represent my interests.

4. Throughout the period of time that [appellees] represented the family with regard to the transfer of the farm and the events which arose as a result of the transfer, my siblings and I placed trust and confidence in [appellees]. They provided legal advice, which we relied on. Whenever we had questions or concerns about issues which arose, [appellees] assured me and my siblings that they could handle the situation, were working to address or resolve the situation, and that there was nothing to worry about.

The affidavit of Conrad V. Aschenbach states:

9. When the notices of deficiency were issued, the family was not unduly concerned, because Mr. Brown had indicated that a challenge by the Internal Revenue Service was a possibility, and that he had been prepared all along to address the issue, should it arise. Upon receipt of the notices of deficiency, Mr. Brown once again reassured the family that the transaction was legitimate, and that the controversy with the Internal Revenue Service would be resolved without the payment of additional taxes.

10. During the time from when Montgomery County refused to record the deed throughout the duration of the litigation involving the Internal Revenue Service, Mr. Brown provided constant assurances that the transaction was a bona fide sale, and that he would solve all of the problems that had arisen since the closing. Mr. Brown frequently used the phrase "no adjustment" to assure me and the family that the controversy would be resolved without having to pay additional taxes.

11. On numerous occasions, my wife and I and other members of the family spoke with Mr. Brown about developments in the case. In most, if not all, of these discussions, Mr. Brown assured us that there was nothing to worry about, that he was doing whatever was necessary to address the situation, and there

would be no adverse tax adjustment arising from the sales transaction.

12. It was not until sometime after Judge Peter Messitte issued his written opinion in the legal malpractice case against Mr. Wolf and Piper & Marbury that my wife and I understood the malpractice and deception that [appellees] had exercised throughout this series of events. The affirmation of Judge Messitte's opinion by the Court of Special Appeals only served to further reinforce our understanding of the nature and extent of the malpractice and deception committed by [appellees]. Investigations undertaken by our *present* attorneys thereafter brought to light Mr. Bonsall's involvement and liability as well. [Emphasis in original.]

Although Lois Aschenbach does not expressly say appellees misled her, her statements that she placed trust and confidence in appellees, and that she and her siblings were consistently "assured" that there "was nothing to worry about" permit an inference that appellants were misled. The affidavit of Conrad Aschenbach states a "deception" that can be inferred from the continued assurances of no adverse tax adjustment, followed by the action against Mr. Wolf.

William I. King, son of W. Lawson King, expressly alleges concealment by appellees through control of the negotiations and litigation and lack of disclosure. In answers to interrogatories, William I. King states:

Defendants undertook to control the negotiations and litigation with the IRS so as to conceal from the Plaintiff that it was the Defendants' wrongdoing which led to the deficiency assessment in the first place.... At no time did the Defendants fully disclose their relationship in the transaction, or the inherent conflicts of interest which existed by continuing the representation of the Debtor throughout the various phases of the problem as it developed.

It is certainly obvious that appellees quickly and consistently ascribed blame to other counsel and were instrumental in the decision to file suit against Mr. Wolf and Piper & Mar-

bury. They even sought out counsel for appellants for that purpose. From these activities, one could infer appellees created a smoke screen to obscure their own potential liability.

As stated by William I. King in answers to interrogatories from the Bankruptcy Court proceedings, "[t]he Defendants were instrumental in the retention of Bayard Z. Hochberg to bring the action and the Defendants consulted with Hochberg and reviewed the significant pleadings he prepared or filed in this case, prior to their filing."

The affidavit of James Wriley Jacobs, Sr., states:

19. The family met with Mr. Hochberg, and Mr. Hochberg worked with Mr. Brown and Mr. Sturm to investigate the facts and circumstances surrounding the events that transpired from the fall of 1981 up to the settlement with the Internal Revenue Service. At no time did Mr. Hochberg or anyone else suggest to the family that Mr. Brown and Mr. Sturm were responsible for the losses suffered by the family.

The affidavit of Elizabeth Jeanne Jacobs, daughter of W. Lawson King, states the following:

14. Mr. Brown and Mr. Sturm told the family that Mr. Wolf and his law firm Piper & Marbury were the reason the family had to pay $20 million to the Internal Revenue Service to settle the tax case. They suggested that we file a law suit against Mr. Wolf and Piper & Marbury to recoup the money we had to pay to settle the tax case. Based on their advice, the family met with attorney Bayard Hochberg to discuss filing a law suit.

The active and ongoing involvement of appellees in the litigation with Wolf and Piper & Marbury is confirmed by Mr. Hochberg in deposition. His first meeting on this matter was with Mr. Bonsall and an appellee. His initial engagement letter was actually addressed to appellees. Much of his investigation was based on information provided by appellees. He sent them the original complaint for review and comment. As to the May 2, 1991 letter from George Beall, Mr. Hochberg

indicated that he did not agree with Mr. Beall's conclusions as to the potential liability of appellees. It does not appear that Mr. Hochberg sent the letter to appellants, but he did send it to Mr. Brown.[10] At no time did he advise or suggest to appellants that "any person other than Mr. Wolf or Piper & Marbury were legally responsible to them." The deposition of James Wriley Jacobs, Sr., goes on to state:

20. At no time did Mr. Brown, Mr. Sturm, or Mr. Hochberg advise the family that anyone other than Mr. Wolf and Piper & Marbury were the cause of the damages the family suffered in settling the law suit with the Internal Revenue Service for $20 million. Instead, Mr. Brown, Mr. Sturm, and Mr. Hochberg advised the family that Mr. Wolf and Piper & Marbury were the sole cause of the damages the family suffered.

The forwarding by Mr. Hochberg of the Beall letter to Mr. Brown reflects the continued involvement of at least one of the appellees in the proceedings and permits an inference of continuing control by appellees over the dissemination of information to appellants.

---

**10.** Mr. Hochberg's deposition reflects the following regarding the Beall letter:

Q. Okay. And if in fact this letter, as we have noted it, that the letter carries the handwritten notation on the top of it "Please copy for Mr. King," and since this is 1991, can we assume that would be Mr. Billy King?

A. I would assume.

Q. It appears as though his letter may have been sent to Mr. Billy King.

A. See, that's not my writing up there.

Q. Okay.

A. I don't think it is my office's writing. My office's writing is down at the lower left.

Q. Where you send a copy to Mr. Brown?

A. I said I know that I sent that to Mr. Brown. This letter I'm led to believe comes out of Mr. Brown's file.

It appears that the correspondence may have been sent to William King by appellees. Lois Aschenbach stated in her deposition that she had not seen it. Conrad Aschenbach indicated he had seen it but had not read it in its entirety.

The concept of limitations is to balance the interests between diligent plaintiffs and would-be defendants in addition to the enhancement of administrative efficiency. *Hecht v. Resolution Trust Corp.*, 333 Md. 324, 635 A.2d 394 (1994); *Doe v. Maskell*, 342 Md. 684, 679 A.2d 1087 (1996) *cert. denied, Roe v. Maskell,* — U.S. —, 117 S.Ct. 770, 136 L.Ed.2d 716 (1997); *Doe v. Archdiocese of Washington, supra.* Throughout the general discussion on limitations, we refer to the individual who has "slumbered on his rights." *Maskell,* 342 Md. at 689–690, 679 A.2d 1087; *Archdiocese of Washington,* 114 Md.App. at 177, 689 A.2d 634. This does not appear to be a situation in which appellants truly slumbered, but if they have, an inference could be drawn that they were purposely lulled to sleep, if not sedated, by extended and diversionary litigation encouraged by appellees.

As to "policy considerations unique to each situation," the actual circumstances surrounding the attorney-client relationship and an ongoing representation should be a factor for consideration by the fact finder on a case-by-case basis, even if continued representation by the attorney does not automatically toll the statute of limitations. *See Watson v. Dorsey,* 265 Md. 509, 290 A.2d 530 (1972).

In discussing the policy basis for the continued course of treatment rule relating to physicians and patients, the Court of Appeals in *Hecht* explains that the rule was applied because of the confidential relationship between the physician and the patient. "Because of this relationship of trust and reliance, the patient is excused from making inquiry questioning the physician's care." *Id.* at 337–338, 635 A.2d 394. Although the continuous course of treatment rule was subsequently limited by legislation, the policy reasoning remains instructive.

There should be no less societal interest in maintaining the confidential relationship between attorney and client than that in maintaining the physician and patient bond. The attorney-client relationship is also one of trust and reliance and, therefore, a factor that a fact finder should be able to consider in determining whether a client has acted reasonably under the

circumstances and because of which he may be excused for limited or delayed inquiry.

Therefore, whether appellants acted reasonably in light of both their longtime and continuing professional relationship with appellees and the ongoing Wolf litigation is a question of fact. The inherently related question of whether appellants' failure to discover the cause of· action was due to lack of diligence or to appellees' concealment is also ordinarily a question of fact. *Herring v. Offutt,* 266 Md. 593, 295 A.2d 876 (1972).

For these reasons, I respectfully dissent.